**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Thomas Donald CHESTANG, a/k/a
Donnie, and Roy H. Chestang,
Defendants–Appellants.**

**No. 87–7304.**

United States Court of Appeals,
Eleventh Circuit.

July 13, 1988.

Donald M. Briskman, Mobile, Ala., for Thomas Chestang.

Donald G. Beebe, Mobile, Ala., for Roy Chestang.

J.B. Sessions, III, U.S. Atty., E.T. Rolison, Mobile, Ala., for plaintiff-appellee.

Before RONEY, Chief Judge, CLARK, Circuit Judge, and MORGAN, Senior Circuit Judge.

CLARK, Circuit Judge:

After a jury trial, Roy and Thomas Donald Chestang were convicted of conspiring to possess cocaine with intent to distribute and conspiring to distribute cocaine. *See* 18 U.S.C.A. § 2; 21 U.S.C.A. § 846 (West 1988). The Chestangs appeal their convictions, contending that the district court erred in (1) allowing the statements of their coconspirators to be admitted into evidence under Fed.R.Evid. 801(d)(2)(E), (2) allowing the endorsements on certain money orders and cashier's checks to be admitted into evidence under Fed.R.Evid. 902(9), (3) denying their motions for dismissal of the indictments based on the government's failure to

comply with Fed.R.Crim.P. 16, and (4) making prejudicial remarks restricting their cross-examination of a government witness. For the reasons which follow, we affirm.

### I.

The government alleged that the Chestangs were the ring leaders of a drug conspiracy that transported cocaine from Alabama to Michigan. To prove its allegations, the government sought to introduce into evidence the statements of the Chestangs' coconspirators pursuant to Fed.R. Evid. 801(d)(2)(E), which provides that a statement offered against a party is not hearsay if it is "a statement by a conspirator of [the] party during the course and in furtherance of the conspiracy." The Chestangs objected, arguing that the government could not introduce the statements without first establishing that a conspiracy existed. *See United States v. James,* 590 F.2d 575, 580–81 (5th Cir.) (before statements are admitted against a defendant under Rule 801(d)(2)(E), there must be substantial evidence that a conspiracy existed, that the defendant and the declarant were members of the conspiracy, and that the statements were made in the course of and in furtherance of the conspiracy), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed. 2d 283 (1979).

At a *James* hearing conducted outside the presence of the jury, Bart Bryars, an indicted coconspirator,[1] testified for the government. His testimony detailed the following sequence of events. On several occasions Roy Chestang asked him to be on the lookout for anyone wishing to purchase a large quantity of drugs. Tr. 63–65. When Bryars, who lived in Michigan, visited the Chestangs in Alabama, Thomas Chestang told him that he sold cocaine that he obtained from Florida. Tr. 66. Upon returning to Michigan, Bryars called Roy Chestang to tell him that he had found a bartender in Michigan who wanted to purchase cocaine. Tr. 69–70. Roy Chestang informed Bryars that he and Bryars' sister, Andie, were going to be married and that

they would discuss the situation when Bryars came to Alabama for the wedding. Tr. 71. When Bryars returned to Alabama, the Chestangs agreed to give him cocaine to take back to Michigan "to establish a trade." Tr. 71–73. After the wedding, Bryars, along with Thomas Chestang and Mike Chidester, transported cocaine and marijuana to Michigan and left a sample of cocaine with the interested bartender. Tr. 73–76. Bryars ended up selling the cocaine in Michigan, and Roy Chestang instructed Bryars to send him the proceeds of the cocaine sales by cashier's checks. Tr. 77. The Chestangs subsequently met Bryars twice in Tennessee to give him additional quantities of cocaine to take to Michigan. Tr. 79–81.

At the conclusion of Bryars' testimony, the district court found that there was sufficient evidence of a conspiracy involving the Chestangs to admit the coconspirator statements. Tr. 82. Bryars repeated the testimony he gave during the *James* hearing at trial. His testimony, however, was not the only evidence against the Chestangs. Chidester testified that he, Bryars, and Thomas Chestang met with Joseph Mayzar in Michigan to discuss whether Mayzar would be interested in purchasing cocaine. Tr. 439. Bryars' wife, Connie, testified that she had accompanied her husband to Tennessee, where he obtained cocaine from the Chestangs. Tr. 337–41. After the government concluded its case, the district court held that all the statements of the Chestangs' coconspirators introduced at trial were admissible. Tr. 486–91. *See United States v. Norton,* 755 F.2d 1428, 1431 (11th Cir.1985) (district court can permit evidence to proceed chronologically, relying upon the government to "connect-up" the coconspirator statements).

■ The Chestangs contend that the testimony of Bryars was not "independent evidence" of a conspiracy because much of it consisted of the statements sought to be admitted under Rule 801(d)(2)(E), and that the district court therefore erred in admitting the coconspirator statements. It is

---

1. Bryars had been convicted of drug offenses in Michigan and sentenced to ten years in prison.

true, as the Chestangs note, that we have previously held that "fulfillment of the conditions of admissibility [regarding Rule 801(d)(2)(E) statements] must be accomplished by evidence *independent* of the coconspirator statement[s] [themselves]." *James*, 590 F.2d at 581 (emphasis added). *See also United States v. Zielie*, 734 F.2d 1447, 1457 (11th Cir.1984) ("[H]earsay statements are admissible at the *James* hearing with one caveat—the court may not 'rely upon the content of the very statement whose admissibility is at issue.' "). But the Supreme Court has recently held that Fed.R.Evid. 104(a), which provides that district courts are not bound by the rules of evidence (except those with respect to privileges) in determining preliminary questions concerning the admissibility of evidence, permits district courts to consider the coconspirator statements sought to be admitted under Rule 801(d)(2)(E) in determining whether a conspiracy existed, whether the defendant and the declarant were members of the conspiracy, and whether the statements were made in the course of and in furtherance of the conspiracy. *See Bourjaily v. United States*, —— U.S. ——, ——, 107 S.Ct. 2775, 2779–80, 97 L.Ed.2d 144 (1987). Thus, our decision in *James* has been overruled to the extent that it did not allow district courts, in making preliminary factual determinations under Rule 801(d)(2)(E), to examine the coconspirator statements sought to be admitted. The district court therefore did not err in considering the coconspirator statements in determining whether a conspiracy involving the Chestangs had been established.

■ We need not decide whether the district court could have relied *solely* on the coconspirator statements in making preliminary factual determinations under Rule 801(d)(2)(E).[2] In addition to the coconspirator statements themselves, there was sufficient independent evidence (for example, the testimony of Chidester and Connie Bryars) adduced at trial to support the district court's finding that the government had established by a preponderance of the evidence[3] that the Chestangs were involved in a conspiracy and that the coconspirator statements sought to be admitted were made in the course of and in furtherance of the conspiracy.

## II.

In December of 1986, a federal magistrate ordered the government to disclose and produce to the Chestangs any grants of immunity or promises of favorable treatment made to witnesses. Record, Vol. 1, at Tab 14. On March 17, the day before she testified as a government witness, Connie Bryars was given a letter by E.T. Rolison, an Assistant United States Attorney.[4] The letter stated that Mrs. Bryars would not be prosecuted in the Southern District of Alabama for any offenses arising out of the conspiracy involving the Chestangs. Tr. 369. On that same day, but before Mrs. Bryars was given the letter, Donald Beebe, Roy Chestang's attorney, asked Rolison whether Mrs. Bryars had been given a written offer of immunity. Tr. 377, 386. Because he had not yet given Mrs. Bryars the letter, Rolison told Beebe that no such offer had been made. Tr. 386. He did, however, inform Beebe that the government was "not after" Mrs. Bryars. Tr. 372–73, 386. Rolison never told Beebe or Donald Briskman, Thomas Chestang's attorney, about the letter he gave Mrs. Bryars. Tr. 372.

During direct examination, Rolison asked Mrs. Bryars whether she had been charged in the Southern District of Alabama with conspiracy to distribute cocaine. Mrs. Bryars answered that she had not been

---

2. The *Bourjaily* Court did not find it necessary to decide whether a district court can rely solely on the coconspirator statements sought to be admitted in making preliminary factual determinations under Rule 801(d)(2)(E). *See Bourjaily*, —— U.S. at ——, 107 S.Ct. at 2780–81.

3. We held in *James* that preliminary facts relevant to Rule 801(d)(2)(E) had to be proven by

"substantial evidence." 597 F.2d at 580–81. In *Bourjaily*, the Supreme Court held that such facts need only be proven by a "preponderance of the evidence." —— U.S. at ——, 107 S.Ct. at 2779.

4. Rolison gave Mrs. Bryars the letter at 5:30 p.m. Tr. 383.

charged with conspiracy. Tr. 353. Rolison also asked Mrs. Bryars whether she had been told that she would not be prosecuted in the Southern District of Alabama for cocaine possession or distribution. Mrs. Bryars again answered that she understood she would not be prosecuted for those offenses. Tr. 353–54. On cross-examination, Beebe asked Mrs. Bryars whether she had been told that she would not be charged if she testified at trial and cooperated with the government. Mrs. Bryars answered that she had been told she would not be charged if she testified against the Chestangs. Tr. 356. Later on during cross-examination, Beebe found out about the letter Rolison had given Mrs. Bryars the day before. Tr. 369. He and Briskman immediately asked the district court to dismiss the Chestangs' indictments for the government's failure to comply with Fed.R. Crim.P. 16(c). Tr. 370. After a hearing, the district court refused to dismiss the indictments, ruling that the Chestangs had not been prejudiced because the contents of the letter had basically been disclosed during Mrs. Bryars' direct examination. Tr. 385.

 There is no question that Rolison had a duty to disclose the existence of the letter to Beebe and Briskman prior to Mrs. Bryars' testimony. *See* Fed.R.Crim.P. 16(c) ("If, prior to or during trial, a party discovers additional evidence or material previously requested or ordered, which is subject to discovery or inspection under this rule, he shall promptly notify the other party or his attorney or the court of the existence of the additional evidence or material."). *See generally Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed. 2d 104 (1972) (discussing the government's duty to disclose favorable treatment given to witnesses in exchange for their testimony). Although suppression of requested evidence "violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution," *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), this is not a case in which material evidence was actually "withheld" by the government. First,

Rolison had told Beebe the day before Mrs. Bryars testified that the government was not interested in prosecuting her. Second, Rolison brought out the favorable treatment on direct examination by asking Mrs. Bryars whether she had been or was going to be charged with any drug offenses in the Southern District of Alabama.

The fact that Rolison violated Rule 16(c) by not disclosing the letter to Beebe and Briskman does not mean that the Chestangs' indictments should be dismissed. If a district court finds out that a party has violated a discovery order, it "may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing the evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Fed.R.Crim.P. 16(d)(2). The language of Rule 16(d)(2) makes it clear that sanctions for discovery violations are discretionary. *See United States v. Euceda–Hernandez,* 768 F.2d 1307, 1312 (11th Cir.1985) (factors that the district court must weigh in exercising its discretion to impose Rule 16(d)(2) sanctions include the reasons for the government's delay in affording the required discovery, the extent of prejudice, if any, the defendant has suffered because of the delay, and the feasibility of curing such prejudice by granting a continuance or, if the jury has been sworn and the trial has begun, a recess).

At the latest, Beebe and Briskman found out about Mrs. Bryars' immunity from prosecution during Rolison's direct examination. This is evidenced by the fact that Beebe cross-examined Mrs. Bryars about her agreement with the government *prior* to finding out about the letter. Tr. 356. Thus, although Beebe and Briskman did not know that Mrs. Bryars had been given a written offer of immunity, they were aware of the government's promise not to prosecute and took full advantage of that knowledge to attempt to impeach Mrs. Bryars' credibility after the district court refused to dismiss the indictments. Tr. 389–92, 404–07. Under these circumstanc-

es, we cannot see how the Chestangs were prejudiced by Rolison's failure to disclose the letter prior to Mrs. Bryars' testimony. *Cf. United States v. Scharf,* 558 F.2d 498, 501 (8th Cir.1977) (where defense attorney was aware of immunity grants prior to his cross-examination of witnesses and took full advantage of that knowledge, district court's refusal to order government to disclose all grants of immunity, if error, was harmless). Though we do not condone Rolison's failure to comply with Rule 16(c), it is clear that the district court did not abuse its discretion in refusing to dismiss the Chestangs' indictments.

### III.

■ During its case-in-chief, the government sought to introduce into evidence several cashier's checks drawn on two Michigan banks—the Lumberman's Bank and the First of America Bank—made out to Roy Chestang and his wife, Andie, in an attempt to show that Bart Bryars sent the Chestangs money for the cocaine he sold in Michigan. The district court admitted the checks after bank representatives, over objections, identified them as belonging to their respective banks. Tr. 270–71, 297–300. At first, the district court seemed to agree with the Chestangs' argument that the endorsements on the instruments were inadmissible hearsay even if the instruments themselves were admissible as records of a regularly conducted business activity under Fed.R.Evid. 803(6), Tr. 275, but later held that the checks and their endorsements were admissible under Fed. R.Evid. 902(9). Tr. 284. Once the checks were admitted, the district court, again over objections, allowed the bank representatives to testify that the checks were endorsed by Roy and Andie Chestang even though the representatives could not identify the endorsements. Tr. 286–90, 301–04.

The Chestangs object to the admission of the endorsements on two grounds. First, they argue that by pleading not guilty they contested the effectiveness of the endorsements, thereby forcing the government to authenticate them under Rule 902(9) and § 3–307 of the Uniform Commercial Code. *Cf. United States v. Carriger,* 592 F.2d 312, 316 (6th Cir.1979) (no testimony was required to establish the "authenticity" of signatures on promissory notes under § 3–307). Second, they argue that the endorsements, even if self-authenticating under Rule 902(9), constituted inadmissible hearsay under Fed.R.Evid. 801(c). *Cf. United States v. DeSimone,* 660 F.2d 532, 543 (5th Cir. Unit B 1981) (rental agreement bearing defendant's signature was properly admitted under the business record exception to the hearsay rule); *United States v. Smith,* 609 F.2d 1294, 1301–02 & n. 7 (9th Cir.1979) (although hotel registration records which contained defendant's signature could be regarded as nonhearsay admissions, they were admissible under the business record exception to the hearsay rule).

We need not decide whether the government failed to authenticate the endorsements or whether the endorsements constituted hearsay, for any error in the admission of the endorsements was harmless in light of the evidence against the Chestangs. *See* Fed.R.Crim.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights should be disregarded."). Bart Bryars testified that the Chestangs initially supplied him with three and a half ounces of cocaine to sell in Michigan and that Thomas Chestang had helped him transport the first shipment of cocaine from Alabama to Michigan. Tr. 98–103. Bryars also testified that he asked the Chestangs for more cocaine after selling the first three and a half ounces and that Roy and Thomas Chestang each met him in Tennessee to give him additional quantities of cocaine. Tr. 113–20.[5] Finally, Bryars testified that he sent cashier's checks drawn on the Lumberman's Bank and the First America Bank to Roy Chestang in payment for the cocaine that he

---

**5.** According to Bryars, both Roy and Thomas

Chestang told him what price he should charge

sold in Michigan. Tr. 110–12, 118–19.[6] Bryars' wife, Connie, testified that she accompanied her husband to Tennessee on two occasions to meet with Roy and Thomas Chestang and that her husband received cocaine from the Chestangs at those two meetings. Tr. 337–41. She also testified that Roy Chestang had told her that he was not going to get caught even if he was turned in. Tr. 350. Michael Chidester testified that he, Thomas Chestang, and Bart Bryars had a meeting with Joe Mayzar in Michigan to discuss whether Mayzar was interested in obtaining cocaine. Tr. 439.

Although each of these witnesses had some bias,[7] their testimony was overwhelming evidence of the Chestangs' participation in the conspiracy. Given this quantum of evidence, it was unlikely that the endorsements had a substantial influence on the outcome of the trial. Thus, any error in the admission of the endorsements was harmless. *United States v. Poitier*, 623 F.2d 1017, 1021 (5th Cir.1980).

## IV.

During her cross-examination by Briskman, Connie Bryars testified that a statement she had given to a Drug Enforcement Administration agent was not completely correct. Tr. 421. She also testified that she had seen a copy of the statement the night before her testimony and had told Rolison of the discrepancies but had not made any changes in the statement or written the discrepancies down because she had not had time. Tr. 421–23. Briskman asked her if anything had stopped her from making changes in the statement or writing down the discrepancies, and Mrs. Bryars said that she had "made a comment [that] morning on it." When Briskman repeated the question, Mrs. Bryars responded that Rolison "just said to tell the truth to the best of your knowledge." At that point,

Briskman asked the district court to instruct Mrs. Bryars to answer whether anything had prevented her from making any changes in her previous statement. Tr. 423. The district court refused to do so:

> I see no reason to do that Mr. Briskman. You've been beating this dead horse long enough. And if you want to continue to do that—I think this witness has tried her very best to answer all of your questions. Now, I'm not going to instruct her on anything.

Tr. 423–24. Beebe and Briskman both moved for a mistrial on the ground that the district court's statement was highly prejudicial, but the district court denied the motion. Tr. 426. Before the government concluded its case, the district court gave the jury a special corrective instruction on its previous statement:

> Ladies and gentlemen of the jury, a motion has been made by counsel for the defendants that the Court give you a special instruction with respect to two comments by the Court during Mr. Briskman's cross-examination of Mrs. Connie Bryars, who testified earlier today. Now, those two statements were: One, the Court said in response to [a] request from Mr. Briskman that I instruct the witness to answer a question, I said: You've been beating this dead horse long enough. What I intended to mean was that we had been over that ground and that this was repetition. I did not intend to mean anything other than that. And if I conveyed to you anything other than the fact that the Court was observing that this was repetition, then I want you to disregard it. Because that was not my intention. The Court has the right to move the case along. And if the Court feels that things are repetitious, it may control the case to the point of asking attorneys not to be repetitive.

---

for the cocaine. Tr. 115–16, 121.

**6.** As we previously noted, representatives of the two banks identified the cashier's checks which Bryars sent to Roy Chestang. Tr. 270, 297–98.

**7.** Bart Bryars was seeking to have the government arrange for him to serve his ten-year Michigan sentence in a federal institution and had

asked the government not to prosecute his sister, Andie Chestang. Tr. 177–80, 196–97, 236–37. Connie Bryars had been promised immunity from prosecution. Tr. 353, 368–70. Chidester had pled guilty to a charge of conspiracy and the government recommended that he be given probation. Tr. 441.

So I want you to disregard my statement about beating a dead horse, because I don't want you to think that any question or any answer of that witness was not important. Every question and every answer is important. It's for the jury to decide the weight to give to the testimony and not the judge.

Now, another statement that I made at that time was I said: I think this witness has tried her very best to answer all of your questions. Now, I did not intend to embrace the truth or falsity of what the witness was testifying to. I make no comment as to whether that witness was telling you the truth or not. I just simply said that I thought that witness was trying to answer the questions. Now, I did not mean to infer that she was trying to answer them truthfully or untruthfully or any kind of way. So you are not to pay any attention to the fact that I said she was trying to answer the question. I was not complimenting her in any way, shape, or form or adopting her testimony as believable by the Court. So disregard the Court's statements. The only thing that the Court had any right to do at that time was to, if I felt that Mr. Briskman's motion to require her to do something—I had a right to deny that. Also I had a right to comment on repetition. But beyond that, disregard anything the Court said in that respect.

Tr. 502–03.

■ The Chestangs contend that the district court's statement during Mrs. Bryars' cross-examination was extremely prejudicial and denied them a fair trial. We disagree. Any prejudice caused by the district court's choice of words was alleviated by the corrective instruction. *See, e.g., United States v. Block,* 755 F.2d 770, 777 (11th Cir.1985) (in light of corrective instruction to jury, defendant was not prejudiced by district court's direction to him not to make any "smart-ass remarks" while testifying).

■ The Chestangs also contend that the district court's refusal to instruct Mrs. Bryars to answer Briskman's question regarding her previous statement violated their rights under the confrontation clause of the Sixth Amendment. *See Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974) (a defendant cannot be deprived of the right to effectively cross-examine witnesses against him). As the Supreme Court has recently noted, the confrontation clause is generally satisfied when the defendant is given a full and fair opportunity to probe and expose the infirmities in a witness' testimony. *Delaware v. Fensterer,* 474 U.S. 15, 21–22, 106 S.Ct. 292, 296, 88 L.Ed.2d 15 (1985) (per curiam). Limitations on cross-examination are left to the sound discretion of the district court and are permissible as long as they do not interfere with the defendant's right of confrontation. *United States v. Carter,* 760 F.2d 1568, 1581 (11th Cir.1985).

We find that the Chestangs' confrontation clause argument is devoid of merit because the district court did not curtail or restrict Briskman's cross-examination of Mrs. Bryars in any significant way. First, the district court's "beating a dead horse" remark was directed only at Briskman's questions concerning the reasons for Mrs. Bryars' failure to amend her previous statement, and not at any other questions by which Briskman was trying to expose inconsistencies or bias in Mrs. Bryars' testimony. Second, at the time of the remark, Mrs. Bryars had already answered those questions by testifying that she had not amended her statement or written down the discrepancies in it because she had not had time to do so.

## V.

In sum, we hold that (1) the statements of the Chestangs' coconspirators were properly admitted, (2) Rolison's failure to produce the immunity letter he gave to Mrs. Bryars did not warrant dismissal of the indictments, (3) the admission of the endorsements on the cashier's checks, if error, was harmless, and (4) the district court's remark during Mrs. Bryars' cross-examination was cured by the corrective instruction and did not violate the confron-

tation clause. Accordingly, we affirm the Chestangs' convictions.

AFFIRMED.