**UNITED STATES of America, Plaintiff–Appellee,**

v.

**MOBILE MATERIALS, INC. and Gerald O. Philpot, Defendants–Appellants.**

**No. 86–1756.**

United States Court of Appeals, Tenth Circuit.

July 28, 1989.

Mack Muratet Braly of Mack Muratet Braly & Associates, Tulsa, Okl., for defendants-appellants.

Andrea Limmer, Atty., Dept. of Justice, Washington, D.C. (Douglas H. Ginsburg, Asst. Atty. Gen., W. Stephen Cannon, Deputy Asst. Atty. Gen., and John J. Powers, III, Atty., Dept. of Justice, Washington, D.C., with her on the brief), for plaintiff-appellee.

Before McKAY, MOORE and BALDOCK, Circuit Judges.

## ON PETITION FOR REHEARING

PER CURIAM.

In our last disposition of this case, we declined to consider various points raised by appellants because we lacked relevant portions of the trial transcript. *United States v. Mobile Materials, Inc. (Mobile Materials II)*, 871 F.2d 902, 906 n. 1, 918 (10th Cir.1989). This case illustrates the need for appellate counsel to monitor carefully the preparation, designation and transmission of the record on appeal. Three problems occurred here.

First, although a substantial portion of the trial transcript was ordered and filed [1] at the district court, some portions of the filed transcript were not transmitted to the court of appeals. *See* Fed.R.App.P. 10(b)(1) (appellant must order transcript); Fed.R.App.P. 11(b) (court reporter must file transcript with the clerk of the district court & clerk must transmit complete record to court of appeals). These portions of the transcript were not transmitted to the court of appeals because they were not designated for transmission. *See* Appellants' Petition for Rehearing, ex. I (Designation of Record on Appeal filed Sept. 29, 1986).

The second problem in this case is that another portion of the transcript was never filed with the district court, nor was it designated for transmission. We think that these errors should have been apparent to counsel upon receipt of his copy of the district court clerk's letter of October 28, 1986, transmitting the limited record on appeal and containing the district court docket sheet as an index to the record on appeal. In the interest of justice, however, we granted appellants' motion to supplement the record with the missing volumes of transcript that had been filed with the district court. For the same reason, we also obtained a final volume of the transcript which had not been filed at the district court.

The third problem is that no statement of proceedings was prepared by appellant

---

1. Appellants correctly point out that a filed transcript is part of the record on appeal. Fed.R. App.P. 10(a). However, ordinarily, this court considers appeals on a limited record which has been designated for transmission by the parties. *See* 10th Cir.R. 10 & 11 (Jan. 1, 1989).

upon learning that a reporter was unable to locate notes of a brief exchange between the court and the jury. Fed.R.App.P. 10(c) allows for such a statement to be included as part of the record on appeal when a transcript is unavailable. The exchange in question occurred when the jury reported to the court that it was unable to reach a verdict. No steps have been taken to cure the problem of the missing notes, and the parties disagree about the characterization of the district court's brief statements.

We now consider the balance of the appeal. On rehearing, we affirm the judgments below.

## I.

"Any agreement between competitors pursuant to which contract offers are to be submitted or withheld from a third party constitutes bid rigging per se violative of 15 U.S.C. section 1." *United States v. Portsmouth Paving Co.*, 694 F.2d 312, 325 (4th Cir.1982); *United States v. W.F. Brinkley & Son Constr. Co.*, 783 F.2d 1157, 1160–61 (4th Cir.1986). Appellants (Philpot and Mobile) contend that the case should not have been submitted to the jury on the theory of a grand conspiracy to rig bids. Appellants argue that evidence concerning jobs unrelated to appellants should not have been admitted, and they attack the sufficiency of the evidence which supports the jury's implicit finding of a single conspiracy to rig bids. The arguments of appellants focus on the admissibility of co-conspirator hearsay and whether there was a variance between the indictment and the proof at trial.

## A.

Concerning the district court's decision to admit co-conspirator statements, appellants contend that those co-conspirator statements pertained to "unrelated" jobs, were hearsay, and should not have been admitted. They suggest that the trial court did not admit the statements in accord with the requirements outlined in *United States v. James*, 590 F.2d 575, 580–82 (5th Cir.), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), and *United States v.*

*Petersen*, 611 F.2d 1313, 1330–31 (10th Cir. 1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980).

In *United States v. Hernandez*, 829 F.2d 988 (10th Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 1486, 99 L.Ed.2d 714 (1988), we recognized that after *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), a trial court may admit statements of co-conspirators under Fed.R.Evid. 801(d)(2) after finding, by a preponderance of the evidence that: 1) a conspiracy existed, 2) the declarant and the defendant against whom the declarations are offered were members of the conspiracy, and 3) the statements were made in the course of and in furtherance of the conspiracy. *Hernandez*, 829 F.2d at 993. In making these determinations, the trial court may rely on both the hearsay statements and the independent evidence presented. *Bourjaily*, 483 U.S. at 181, 107 S.Ct. at 2782; *United States v. Wolf*, 839 F.2d 1387, 1393 (10th Cir.), *cert. denied*, — U.S. ——, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988). Thus, the trial court is not limited to independent evidence in making its preliminary factual determinations. *United States v. Chestang*, 849 F.2d 528, 530–31 (11th Cir.1988); *United States v. Perez*, 823 F.2d 854, 855 (5th Cir.1987) (*Bourjaily* "effectively abolishes our *James* constraints"). When practical, the trial judge should make these factual determinations before allowing the co-conspirator statements to be heard by the jury. *Hernandez*, 829 F.2d at 994. However, we have recognized that the trial judge has "considerable discretion" to admit the statements conditionally, subject to their later being connected up. *Id.* at 994 n. 6. Regardless of the order of proof, the district court should make or reaffirm the requisite factual determinations at the conclusion of the evidence. *Petersen*, 611 F.2d at 1230.

In this case, the trial court admitted certain challenged statements conditionally and then determined that the requirements for admissibility had been satisfied after the testimony of the government's first immunized witness, Ken Jacobs. Jacobs

testified that he participated in bid-rigging on Oklahoma highway projects when he became area manager for South Prairie Construction Co. in 1978. He testified that "that just seemed to be the way that the business was done." Rec. supp. I, vol. II at 93. Jacobs generally described how the bid-rigging process worked[2] and then discussed particular jobs involving Philpot and Mobile.

According to Jacobs, "he gave some work away and also took some." *Id.* at 94. He explained a system of complimentary bidding. This system enabled various contractors to prearrange which contractor would submit the lowest bid. Several contractors might agree to submit complimentary bids above an amount specified by a prearranged low bidder, thereby making it quite likely that the prearranged low bidder would be awarded the project. A contractor might agree to submit a complimentary bid because he had received a similar favor in the past. Alternatively, a contractor might agree to submit a complimentary bid, or refrain from bidding entirely, because of a promise by the prearranged low bidder to let that contractor have a job in the future. By its very nature, this scheme was ongoing—future projects served both to create and to satisfy obligations.

The first jobs that Jacobs testified about were SAP–63(126) and SAP–67(83) (the Seminole projects), let by the Oklahoma Department of Transportation (ODOT) on December 21, 1978. Jacobs testified that Philpot contacted him and indicated that he was interested in these jobs. Jacobs agreed to submit complimentary bids on behalf of South Prairie which he thought would assist Mobile in being awarded SAP–67(83) and Cherokee in being awarded SAP–63(126). According to Jacobs, he had not heard from either Philpot of Mobile or Stuart Ronald of Cherokee and needed to

submit his complimentary bids. Jacobs needed amounts to bid above on both projects to avoid the risk of being the low bidder. He testified that he went to a hotel room at the Lincoln Plaza Hotel and was given two numbers to bid above by Philpot and Ronald. Jacobs then turned in his complimentary bids for South Prairie.

Jacobs then testified about rigging project WR–MC–18, the Will Rogers Turnpike job, bid on July 12, 1979. Jacobs said he had been contacted by Ray Broce of Broce Constr. Co. Broce agreed that he would assist Jacobs in getting the Turnpike project by submitting a complimentary bid. In return, Jacobs agreed to submit a complimentary bid on another project near Ratliff City (Stephens–Carter Counties) which Broce wanted. Jacobs delivered a figure to representatives of Broce to enable them to prepare a complimentary bid. Jacobs also testified that he talked to Philpot about the Turnpike job before it was let. Jacobs learned that Philpot was possibly going to bid on the Turnpike job. Jacobs negotiated with Philpot and induced him to give up the Turnpike job in exchange for a complimentary bid on a future project. An upcoming project, F–236(11) (the Ada Bypass), was discussed. Jacobs then related how he withheld South Prairie's bid on the Ada Bypass project because Philpot wanted the Ada Bypass job, and Philpot had helped Jacobs obtain the Turnpike job.

The next job Jacobs testified about was F–91(15), a road-widening job between Davis and Sulphur (the Murray County job). According to the government, South Prairie, Mobile Materials, Washita and Broce rigged the job in favor of Broce, but it was not awarded because the low bid by Broce was too far in excess of the state estimate. Jacobs testified that he initially agreed to give Broce a complimentary bid

---

**2.** In *United States v. Washita Constr. Co.,* 789 F.2d 809, 813–814 (10th Cir.1986), we described the mechanics of a scheme to rig bids on Oklahoma highway construction projects. That description comports with the government's evidence in this case. We do not repeat that description, except to say that the government, in its bill of particulars, named the following companies as co-conspirators with defendants: Amis Constr. Co., Broce Constr. Co. of Okla., Inc. (Broce), Cherokee Paving Co. (Cherokee), Cornell Constr. Co., Cummins Constr. Co., Evans & Assoc. Constr. Co., Frascon, Inc. (Frascon), Glover Constr. Co., Inc., McConnell Constr. Inc., Shawnee Paving Co., South Prairie Constr. Co. (South Prairie) and Washita Constr. Co. (Washita).

on F–91(15) with the understanding that Broce would submit a complimentary bid on a project near Perry (the Noble County or I–35 job). South Prairie was awarded the contract on the project near Perry. Thereafter, Jacobs did not submit a bid on F–91(15). According to Jacobs, he agreed to let Broce have F–91(15) because he no longer wanted to rig bids, but he had a commitment to Broce. Sam Beyer, former Oklahoma field superintendent for Broce Constr. Co., later testified that Philpot was to provide a complimentary bid on F–91(15) based on the numbers Broce provided him.

Not every contractor who was interested in a project could be or would be approached by the members of the conspiracy. Although Jacobs knew which contractors had ordered plans for the various projects, he also knew it was unlikely all would submit competitive bids because of: 1) the nature of the particular projects, and 2) the competitive position of the contractors. Thus, he could surmise the likelihood that a job could be rigged. He could be selective about seeking complimentary bids and thereby creating obligations. For example, Jacobs only contacted Philpot and Broce in an effort to insure that he would be the low bidder on the Turnpike job.

We have reviewed the objections made by appellants during the testimony of Jacobs. Initially, appellants objected on the basis of hearsay when Jacobs testified that he had been contacted by another co-conspirator, Broce. Rec. supp. I, vol. II at 103. The court properly overruled the objection at this point because Jacobs' testimony was not hearsay. The direct testimony of a conspirator (Jacobs) describing his participation in the conspiracy and the actions of others is not hearsay, and the cases concerning co-conspirator hearsay under Rule 801(d)(2) are inapplicable. *United States v. Smith*, 692 F.2d 693, 697–98 (10th Cir. 1982). Thereafter, Jacobs did testify as to statements made by Broce. Sometime later, appellants objected to Jacobs' testimony concerning jobs which did not involve appellants directly. When the trial court made its ruling concerning the admissibility of co-conspirator statements, appellants objected, not on hearsay grounds, but on grounds that the prejudicial effect of Jacobs' testimony outweighed its probative value. Fed.R.Evid. 403.

The government suggests that the appellants failed to object to co-conspirator statements on grounds other than Rule 403. When viewing the record as a whole, however, it is apparent that appellants repeatedly objected to the admissibility of co-conspirator statements as not meeting the requirements of Rule 801(d)(2). Fed.R. Evid. 103(a)(1), requiring a timely objection to evidence which is admitted, was satisfied. The district court, however, did not abuse its discretion in overruling these objections.

There was substantial evidence of a conspiracy to rig bids on Oklahoma highway construction projects. Several contractors had a tacit agreement to share the work and allocate it by rigging bids. The purpose was to circumvent price competition and enhance profitability. *See United States v. Beachner*, 729 F.2d 1278, 1283 (10th Cir.1984). The conspiracy was self-perpetuating and could be plugged into at any time. *Id.* at 1282. Jacobs' testimony directly connected appellants to that conspiracy insofar as the Seminole and Will Rogers Turnpike jobs. Testimony of other witnesses concerning the rigging the Ada Bypass job, particularly the testimony of Clay Wilson and James Freeman, which we discuss below, also connected appellants directly to the conspiracy. Finally, the co-conspirator statements admitted were in the course of and in furtherance of the conspiracy. The statements pertain mainly to setting up bids, the negotiations between the conspirators. At the conclusion of the evidence, it was apparent that the government had connected up the conspiracy evidence.

Appellants seem to argue that a prerequisite to the admissibility of co-conspirator statements is a direct link with independent evidence between every project mentioned at trial and the appellants. *See* Appellants' Reply Brief at 11–12. Not so. As noted, the court may consider both independent evidence and the

statements themselves in deciding whether the statements are admissible under Fed.R. Evid. 801(d)(2). *Bourjaily,* 107 S.Ct. at 2782. A party who joins a conspiracy becomes criminally liable for all acts done in furtherance of that conspiracy. *United States v. Andrews,* 585 F.2d 961, 964 (10th Cir.1978) (reviewing conspiracy law principles). It must be established the declarant and the defendant against whom the statement is offered were members of the conspiracy and that the statement was in the course of and in furtherance of the conspiracy. *Hernandez,* 829 F.2d at 993. Once that is established, the government is not limited to asking only about jobs which the co-conspirator will identify as rigged by the defendant. Of course, lest the government get too far afield, the evidence must be relevant and not unfairly prejudicial. Fed. R.Evid. 402 and 403. Here, the government elicited many co-conspirator statements from various witnesses in order to prove the mechanics and ongoing nature of the conspiracy. A number of rigged jobs were mentioned as the government sought to establish that Philpot had submitted or had received complimentary bids or had refrained from bidding as part of the process. In light of the entire record, we conclude that the trial judge was within his discretion in admitting this evidence, notwithstanding appellants' claim of unfair prejudice. The jury was instructed that the guilt or innocence of each defendant should be based on the words or actions of that defendant. Appellee's Addendum to Brief, Instr. Nos. 5 (jury must consider evidence as it relates to defendants on trial, despite references to other co-conspirators), 12 (mere association not proof of conspiracy).

### B.

■ Appellants claim that the district court should have directed a judgment of acquittal in their favor because the evidence at trial proved several separate conspiracies, each involving a different highway project, rather than a single conspiracy. Essentially, appellants are arguing a variance between the pleading and the proof in this case. A variance occurs when the trial evidence establishes facts different than those charged in the indictment. *United States v. Dickey,* 736 F.2d 571, 581 (10th Cir.1984), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). Such a variance may be prejudicial if it "affects the substantial rights of the accused." *United States v. Morris,* 623 F.2d 145, 149 (10th Cir.), *cert. denied,* 449 U.S. 1065, 101 S.Ct. 793, 66 L.Ed.2d 609 (1980). In *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1945), the Court recognized the danger of transference of guilt when the evidence supported not a single conspiracy, but rather several separate conspiracies only connected by the participation of one key figure in each. *Id.* at 773–774, 66 S.Ct. at 1252–52.

The government was required to prove that Philpot and Mobile "agreed with at least one other individual or entity to participate in the unlawful contract allocation and bid rigging charged." *Portsmouth Paving Corp.,* 694 F.2d at 318. Appellants acknowledge that whether the evidence is sufficient to establish a single conspiracy is a factual matter. *See United States v. Record,* 873 F.2d 1363, 1366 (10th Cir.1989). Upon our review, the evidence must be cast in the light most favorable to the government, and we consider all of the evidence, both direct and circumstantial. *Id.* at 1367. Applying this standard, there is ample evidence of a single conspiracy to submit collusive, noncompetitive and rigged bids, or to withhold bids, on construction projects during the time period specified in the indictment. The evidence reflects "significant overlap in personnel, method of operation, and purpose." *Id.*

Indeed, appellants concede the sufficiency of the evidence for a conspiracy concerning the Seminole Projects (SAP–63(126) and SAP–67(83)), and the Ada Bypass project F–236(11). *See* Appellants' Brief at 20 n. 6. We have discussed the evidence pertaining to the Seminole projects which implicates appellants, and there is a strong link between appellants and anticompetitive be-

havior on the Ada Bypass project.[3]

Mobile was awarded the Ada Bypass job after Frascon, Inc. and Nineteenth Seed Co. submitted higher bids. As noted, Jacobs of South Prairie testified that he did not submit a bid on the Ada Bypass project, thereby keeping with his agreement to repay Philpot for not submitting a bid on the Will Rogers Turnpike project. Clay Wilson, president of Nineteenth Seed Co., testified that he intended to bid on the Ada Bypass project, but was contacted by Philpot prior to the letting. According to Wilson, Philpot requested that Wilson not submit a bid. Wilson still intended to submit a bid, but when he contacted Jacobs of South Prairie to get a subcontract price on concrete work, Jacobs said he would not give Wilson a quote because Jacobs had promised Philpot that he would not bid or quote a price on the Ada Bypass project.

James Freeman of Frascon testified that he planned to bid the Ada Bypass project competitively, but that he was contacted by Philpot prior to the letting. According to Freeman, Philpot requested that Freeman not submit a bid. Freeman's father, who had final bid authority for Frascon, then agreed with Philpot that Frascon would increase its bid to exceed the state engineer's estimate for the project. And that is what happened. Frascon, who would have submitted the low bid but for the collusion, submitted a rigged bid eight percent over the estimate, and was not awarded the job. Rec. supp. I, vol. III at 186.

Other evidence supports the finding that these defendants were part of a Sherman Act conspiracy. Don Hurst of Shawnee Paving Co. testified that Philpot inquired as to whether Hurst was bidding on SAP–67(109) (Seminole County), which was let on July 25, 1980. When Hurst answered in the affirmative, Philpot requested that Hurst not bid the job, but if he did, that he bid around the state engineer's estimate. *Id.* at 312.

Appellants contend that there was error because the jury was misled by evidence of "unrelated" jobs. Appellants' Brief at 22. If the jobs were truly unrelated to this conspiracy and appellants' participation in it, we might agree. But that is not the case. The government may prove a combination and conspiracy in restraint of trade by showing concerted activity designed to achieve that end. *Mobile Materials II*, 871 F.2d at 908. Thus, testimony about the various agreements which facilitated the objective of the conspiracy was permissible. The government need not show that every attempt to rig bids was successful or that every bid on a project was the product of collusion. And after connecting appellants to a particular job which appears to be rigged, the government may then introduce evidence about how the job was rigged. Concerning the Will Rogers Turnpike job, the district court did not abuse its discretion in allowing Jacobs to testify that Broce Constr. Co. was willing to submit a complimentary bid on the project if Jacobs would submit one on the project near Ratliff City (Stephens–Carter Counties). In explaining how the turnpike project was set up, Jacobs directly implicated appellants. That testimony was later corroborated by witnesses associated with Jacobs.

Appellants also challenge the testimony concerning F–91(15), the road-widening job near Davis and Sulphur (Murray County), which the government claimed was rigged by South Prairie, Mobile Materials, Washita and Broce. At trial, the government's witnesses did not testify directly that Philpot's bid on the project was complimentary; however, Sam Beyer of Broce testified that the job was set up and that he assisted in working out the numbers so that Broce would be the prime contractor and Washita would be a subcontractor. Rec. supp. I, vol. II at 238, 241–42. He also testified that Philpot had the numbers which the parties had worked out. *Id.* at 244. Though the issue is close, we have read the testimony in its entirety and we cannot say that it was an abuse of discretion for the

---

**3.** Concerning the Ada Bypass project, appellants were convicted in count 3 of making false and fraudulent statements to the United States Department of Transportation, by filing a false affidavit of non-collusion.

trial court to admit evidence concerning F–91(15). From this, it follows that the trial court could admit evidence concerning the other jobs which were exchanged for complimentary bids on F–91(15). Thus, Jacobs could testify that he was amenable to submitting a complimentary bid on F–91(15) in exchange for Broce submitting a complimentary bid on the project near Perry (Noble County, I–35 job).

Appellants also objected to the testimony of Jacobs' former boss, James Baldwin, on Fed.R.Evid. 403 grounds. Rec. supp. I, vol. II at 208. Baldwin corroborated the testimony of Jacobs and explained the mechanics of the bid-rigging process. He testified to the ongoing nature of the conspiracy, explaining that if a contractor sets up a job with several complimentary bids, it will take more than a few months to pay back all the complimentary bidders. Indeed, "absent an affirmative showing of the termination of the agreement, the conspiracy must be presumed to have continued." *Portsmouth Paving Corp.*, 694 F.2d at 318. Again, we find no abuse of discretion by the trial judge in admitting this testimony. Appellants were able to point out on cross examination that some of the witnesses simply had no direct knowledge which would connect the appellants to rigged bids.

## II.

▮ Continuing the variance argument, appellants suggest that if the proof established one or more smaller conspiracies in which they participated, their convictions must be reversed. They contend that the jury was not instructed properly on the necessity of finding a single conspiracy. Appellants rely on *United States v. Mastelotto,* 717 F.2d 1238 (9th Cir.1983), and *United States v. Miller*, 715 F.2d 1360 (9th Cir.1983), *modified*, 728 F.2d 1269 (9th Cir. 1984), *rev'd*, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985). To the extent that appellants are arguing that a defendant's fifth amendment grand jury guarantee is compromised if the government proves a narrower scheme at trial than alleged in the indictment, those portions of *Miller* and

*Mastelotto* so holding were overruled in *United States v. Miller*, 471 U.S. 130, 135, 105 S.Ct. 1811, 1814, 85 L.Ed.2d 99 (1985). *See United States v. Parkhill*, 775 F.2d 612, 615 n. 6 (5th Cir.1985) (recognizing overruling). In *Miller*, the Supreme Court indicated that the fifth amendment grand jury guarantee is not violated if a defendant is convicted upon evidence which tends to show a narrower scheme than that contained in the indictment, provided that the narrower scheme is fully included within the indictment. *Miller*, 471 U.S. at 135–38, 105 S.Ct. at 1814–16.

Appellants argue that there is a risk that some of the jurors may have found the broad conspiracy to rig bids as alleged in the indictment while others may have found a conspiracy limited to the Ada Bypass project. Appellants' Brief at 30. In *Mastelotto*, a concern, still viable after *Miller*, was insuring that a defendant's right to a unanimous verdict is respected by instructing the jurors that they must all agree on the existence of, and defendant's participation in, the same scheme to defraud. *See also United States v. Echeverry*, 698 F.2d 375 (9th Cir.), *modified*, 719 F.2d 974 (9th Cir.1983) (if jurors might be confused concerning multiple conspiracies based on different acts, it may be necessary to augment unanimity instruction).

In settling the jury instructions, appellant objected that their proposed jury instruction was not used. *See* rec. supp. III, vol. I at 161–62 (objections); rec. vol. I, doc. 110 at 35–36 (proposed jury instruction entitled "Single Conspiracy or Acquit"). The instruction attempted to amplify the proposition that if the jury found separate conspiracies, rather than the single conspiracy contained in Sherman Act count of the indictment, it must acquit the appellants. That jury instruction was an incorrect statement of the law, however, to the extent that it required the jurors to find that every project listed in the bill of particulars supplied by the government was part of the Sherman Act conspiracy described in count I of the indictment. As noted, the government may prove a narrower scheme than alleged. *Miller*, 471 U.S. at 140, 105 S.Ct. at 1817. The instruction given correctly

noted that the jury was not required to find that *every* project in which defendants were involved was part of the conspiracy.

At the charging conference, appellants wanted their proposed instruction because it instructs that, if the jury found that the single conspiracy charged in the indictment did not exist, then it must acquit the defendants, not only on the Sherman Act count, but also on the other substantive counts contained in the indictment. Rec. supp. III, vol. I at 162. This statement is wrong; a failure of proof on the Sherman Act count did not require the jury to acquit on the false swearing and mail fraud counts. The district court properly rejected the proposed instruction. Again, the instruction given was adequate; it told the jury that it must find the defendants not guilty of the Sherman Act count if it concluded "that the government has failed to prove the existence of the single, continuing conspiracy charged in the indictment."

### III.

Appellants argue that the government should not have informed the jury that several of its witnesses rigged bids and were immunized from prosecution. Appellants claim that the government also elicited information about the convictions of witnesses who testified, or about the convictions of the companies they worked for. There being no contemporaneous objection, we analyze this claim for plain error affecting substantial rights of the accused. Fed. R.Civ.P. 52(b). We find that this claim is without merit.

Appellants rely on *United States v. Austin,* 786 F.2d 986 (10th Cir.1986), which held that the convictions of ten co-conspirators, two of whom testified, could not be used as substantive evidence of guilt in considering the case against the defendants on trial. *Id.* at 991–992. For credibility purposes, the conviction of a testifying codefendant may be elicited by the government or the defense, but a cautionary instruction, restricting the use of the conviction to credibility, is generally essential. *United States v. Baez,* 703 F.2d 453, 455 (10th Cir.1983).

The government made no reference to any convictions in its opening statement, or closing argument. No convictions related to this case were disclosed during the government's examination of its witnesses.[4] In its opening statement, the government told the jury that it was presenting part of its case with the testimony of contractors who admitted their participation in bid-rigging and whom had been granted immunity from prosecution for truthful testimony. Rec. supp. I, vol. I at 12. This simply is not a case in which the government was arguing directly or indirectly that appellants were guilty because other co-conspirators had entered into immunity agreements with the government. To the contrary, the government was simply anticipating "attempts by defense counsel to attack its witnesses' credibility." *United States v. Koppers Co., Inc.,* 652 F.2d 290, 299 (2d Cir.), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981). Indeed, beginning with his opening statement,[5] defense counsel did use the im-

---

**4.** During the course of the trial, two witnesses referred to convictions unrelated to this prosecution. When he was asked why he left South Prairie, Jacobs explained the circumstances. He testified that after South Prairie's parent entity had been convicted of bid rigging in another state, he was asked to sign a letter that he had not engaged in bid rigging. He was terminated when he could not do so. Rec. supp. I, vol. II at 89.

Another government witness, Baldwin, testified concerning the impetus of his plea agreement with the government. He testified that after his general superintendent in Kansas had been convicted of bid rigging, he (Baldwin) decided to enter into a plea agreement with the government.

**5.** Mr. Braley: Keep in mind as you are listening to the government's witnesses, as Mr. Gardner told you about this immunity. To me, this immunity is the Government's dirty little secret. These men come in here and they have every reason to indulge in the maximum amount of maybes and probablies and supposeds and gee, I think so, and he bid the job so he must have been all right and words like this. I want you to listen for these weasley, slimey words from the these Government immunity witnesses because those words should not be allowed to convict a man of the serious crime of bid rigging.

Rec. supp. I, vol. I at 25; *see also id.* at 27.

munity agreements to attack the credibility of the government's witnesses. Each immunized witness discussed his participation in bid-rigging and was subject to cross examination by the defense. In rebuttal, the government argued that the jury should look at the testimony of its immunized witnesses carefully because they had been granted immunity. Rec. vol. III at 23.

■ We reject out of hand the notion that the government may not disclose immunity agreements with its witnesses on direct examination for the permissible purpose of minimizing damage to the credibility of these witnesses. We cannot say that the absence of a cautionary instruction during the trial concerning immunity agreements constituted plain error when the permissible purpose of introducing the immunity agreements was clear, and the evidence concerning the participation of the appellants was strong and corroborated by non-immunized witnesses. *United States v. Peterman*, 841 F.2d 1474, 1481 (10th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 783, 102 L.Ed.2d 774 (1989).

### IV.

Appellants next take issue with the trial judge's management of the case during trial and during the jury's deliberations. Specifically, appellants raise three objections: (1) the court's evidentiary rulings were prejudicial to appellants' attempts to show that they were not connected to a conspiracy to rig bids, (2) the court interjected unsolicited comments into the trial process, and (3) the court's post-trial admonitions to the jury coerced a verdict adverse to appellants.

### A.

■ The first of these arguments concerns the testimony of various government witnesses who attempted to implicate appellants in bid-rigging. Beyer, a Broce employee, testified concerning the rigging of F–91(15), a road-widening job between Davis and Sulphur (the Murray County job). Beyer testified that he and Bill Anthony of Washita, agreed to the numbers they would bid on the job so that Broce

would get the job. Beyer also testified that Philpot, who also bid on the job, was in Anthony's hotel room at the Lincoln Plaza when Beyer went there in the morning to discuss the bids. Although Beyer testified that there was no discussion about the bids in the presence of Philpot and that Beyer did not know whether Philpot was in on the bid-rigging, that hardly renders Beyer's testimony irrelevant. Beyer had testified before the grand jury that Philpot had agreed to submit a complimentary bid on the project, and the government impeached Beyer with that testimony. Moreover, on cross-examination, defense counsel highlighted the weaknesses of Beyer's testimony at trial and before the grand jury.

Appellants also claim that it was error to admit the testimony of two other Broce employees (Taylor and Vance) about the Murray County job and the job near Ratliff City (Stephens–Carter Counties) because these witnesses could not connect the appellants with these jobs. We think that the government did connect Philpot to the Murray County job and, as discussed previously, the testimony concerning the Ratliff City job was allowable to explain how the Will Rogers Turnpike job was set up. Philpot was implicated directly in the set-up of the Turnpike job.

Next, appellants claim that the district court erred when it permitted Donald Hurst of Shawnee to testify. If we are reading appellants' brief correctly, the claim here is that there was no link between appellants and Hurst, and indeed, Hurst's testimony "exonerated" appellants concerning the only job which would provide a possible link, SAP–67(109) (Seminole County). Appellants' Brief at 43–44. This is absurd. Hurst testified that Philpot asked him not to bid the job or to bid the job around the state estimate. This testimony was relevant in the extreme concerning appellants' involvement in a bid-rigging conspiracy. It makes no difference that Hurst did not alter his bid as a result of Philpot's request.

### B.

Appellants complain that they were denied a fair trial because the judge was

impatient and angry with defense counsel throughout the trial. According to appellants, the judge's manner conveyed to the jury the impression that the court thought the appellants guilty and the case unimportant. Appellants also contend that they were unable to argue adverse rulings or to make a record. Finally, appellants contend that the court favored the government over the defendants.

 Though it is easy to counsel patience and restraint from the appellate level, our concern must be with the "essential fairness of the trial," because the law, secularly applied, only insures a fair trial, not a perfect one. *United States v. Shelton,* 736 F.2d 1397, 1405 (10th Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 185, 83 L.Ed.2d 119 (1984). We have reviewed the catalog of incidents which appellants have compiled from the transcript to support their claims and do not find reversible error. A trial judge has the prerogative to clarify evidence and assist the jury, provided his comments do not mislead and are not one-sided. *United States v. Singer,* 710 F.2d 431, 436 (8th Cir.1983) (en banc). Likewise, a trial judge may exclude or limit questions or testimony *sua sponte* to expedite the trial, and justice still may be done. The trial judge did not display personal animosity against defense counsel; consistent adverse rulings, without more, do not constitute animosity. *United States v. Panza,* 612 F.2d 432, 440 (9th Cir.), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3019, 65 L.Ed.2d 1118 (1980).

 We are more concerned with counsel's allegations that he was not allowed to make a record because the court summarily denied his objections and refused to state the basis of its rulings. Counsel also tells us that the court conducted sidebar conferences which were not recorded. Of course, under Fed.R.Evid. 103(a)(1), counsel must be allowed to state the specific ground of objection when it is not apparent from the context. The court can require explanations to be concise, however. And under 28 U.S.C. § 753(b), all court proceedings in criminal cases must be recorded. *United*

*States v. Gallo,* 763 F.2d 1504, 1529–32 (6th Cir.1985), *cert. denied,* 474 U.S. 1068, 106 S.Ct. 826, 88 L.Ed.2d 798 (1986). We have reviewed the entire record in this case and think that the district court was familiar with the basis of the objections of appellants. Both parties were represented by able counsel. The summary denial of counsel's objections occurred infrequently, and prejudice has not been demonstrated. As for the sidebar conferences which were not recorded, counsel did not object, but more significantly, no specific error and prejudice has been claimed by appellants. *United States v. Ellzey,* 874 F.2d 324, 330–31 (6th Cir.1989); *Edwards v. United States,* 374 F.2d 24, 26 (10th Cir.1966), *cert. denied,* 389 U.S. 850, 88 S.Ct. 48, 19 L.Ed.2d 120 (1967). Accordingly, reversal on these points is unwarranted.

### C.

At the end of one day's deliberation, the jury foreman sent the court a note advising that the jury was unable to reach a verdict. Appellants contend that the trial court then delivered what amounted to an *Allen* [6] charge which was improper. Even after granting appellants' motion to supplement the record, we do not have a transcript of the district court's comments; according to appellants, as of 1986, the court reporter was unable to locate the notes. Appellants assert that the district court emphasized "the court's crowded docket and herculean efforts to keep the case load moving." Appellants' Brief at 44. Appellants forthrightly admit that they did not object to the court's comments; thus, our review would be restricted to plain error, viewing appellants' claim of error against the entire record. Fed.R.Crim.P. 52(b); *United States v. Young,* 470 U.S. 1, 14–16, 105 S.Ct. 1038, 1045–47, 84 L.Ed.2d 1 (1985).

 To the extent that an *Allen* instruction was not given with the general instructions to the jury, but instead during the course of the jury's deliberations, appellants claim error and rely upon *United States v. Blandin,* 784 F.2d 1048, 1050

6. *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

(10th Cir.1986). But in *United States v. McKinney*, 822 F.2d 946, 950–51 (10th Cir. 1987), we made it clear that *Blandin* did not adopt a *per se* rule prohibiting an *Allen* instruction once a jury commenced deliberations.

■ We also noted in *McKinney* that whether an *Allen* instruction constituted error depended upon whether the instruction was coercive after reviewing the facts of each case. *McKinney*, 822 F.2d at 951; *United States v. Dyba*, 554 F.2d 417, 421 (10th Cir.), *cert. denied*, 434 U.S. 830, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). Here, we have little idea what the district court said, and appellants have not complied with Fed. R.App.P. 10(c), which allows for a statement to be prepared by the parties and approved by the district court, in lieu of the transcript. *See* 9 J. Moore, B. Ward & J. Lucas, Moore's Federal Practice ¶ 210.06[1] (1989); *Vaughn v. Britton*, 740 F.2d 833, 835–36 (11th Cir.1984). We decline to review these comments, which we do not have, even for plain error. Appellants have made no effort to provide us with a statement envisioned by Fed.R.App. 10(c), and it is the responsibility of counsel, particularly when we have expressed our inability to proceed due to the lack of a record, to insure that a complete record is available for our review. *United States v. Hart*, 729 F.2d 662, 671 (10th Cir.1984), *cert. denied*, 469 U.S. 1161, 105 S.Ct. 914, 83 L.Ed.2d 927 (1985).

Our previous judgment, 871 F.2d 902, is modified to reflect our supplemental opinion on rehearing. The judgments of conviction are ·

AFFIRMED.

Judge McKAY joins in this supplemental opinion on rehearing except for the reaffirmance of the court's opinion, *Mobile Materials II*, 871 F.2d 902–19, insofar as that opinion is challenged by the dissent, 871 F.2d 919–24.