**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Randall Clark BYROM, Heriberto Rene Perez, Defendants–Appellants.**

**No. 89-5736.**

United States Court of Appeals, Eleventh Circuit.

Aug. 14, 1990.

As Amended Oct. 11, 1990.

Vincent J. Flynn, Flynn & Tarkoff, Miami, Fla., for defendant-appellant Byrom.

Richard A. Sharpstein, Janice B. Sharpstein, Coconut Grove, Fla., for defendant-appellant Perez.

Dexter W. Lehtinen, U.S. Atty., Barbara A. Ward, Mayra R. Lichter and Linda Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before EDMONDSON and BIRCH, Circuit Judges, and RE [*], Chief Judge.

BIRCH, Circuit Judge:

This appeal presents the potentially recurring issue of whether a videotaped conversation between an informant and a coconspirator can be used to implicate another coconspirator. With a limiting instruction, the district court admitted the videotape into evidence. Both defendants were convicted for conspiracy to import cocaine into the United States. Our review of the record has shown that admission of the videotape was proper; we affirm.

## I. FACTUAL BACKGROUND

This case concerns a cocaine importation conspiracy, organized by defendant-appellant Heriberto Rene Perez, who used the alias Eddie Franco,[1] and which involved airplane pilots David Thomas, Bernard Dudas and defendant-appellant Randall Clark Byrom. In October or November, 1986, Perez, whom Thomas knew as Franco, asked Thomas, previously a charter pilot for Perez, to obtain an airplane to be used for the transportation of narcotics. Thomas located a suitable airplane for which Perez/Franco paid $50,000 in cash, delivered to Thomas in a parking lot.

In approximately February, 1987, Perez/Franco asked Thomas to fly 1,100 pounds of marijuana from Jamaica to Chub Cay in the Bahamas to be loaded onto boats for transportation to the United States. Thomas aborted this trip when he discovered that it was not feasible for the loaded plane to take off from the Jamaican airstrip. In February or March, 1987, Perez/Franco offered Thomas $200,000 to fly 500 kilograms of cocaine from Columbia, South America to Chub Cay, where the cocaine would be loaded onto boats for transportation into the United States. Thomas also canceled this trip because the fuel capacity of the plane was insufficient.

Dissatisfied with the copilot provided by Perez/Franco, Thomas recruited Dudas to be his copilot for the cocaine importation trips. On April 15, 1987, with tickets purchased by Perez/Franco, Thomas and Dudas flew commercially, to Nassau. From Nassau, they were to fly Perez/Franco's plane to Tamiami Airport in Miami, Florida, where Perez/Franco had arranged to have the fuel capacity of the plane increased. Thereafter, Perez/Franco met with Thomas and Dudas on several occasions to discuss the details of the trip to Columbia to obtain 500 kilograms of cocaine. With Perez/Franco's approval, Thomas asked Dudas to be his copilot for transporting the 500 kilogram load of cocaine from Colombia to Spanish Key, near Nassau. Thomas and Dudas agreed to divide Perez/Franco's $200,000 payment. Fearing detection, Thomas planned to leave the plane on Treasure Key, and he asked Byrom to fly

---

[*] Honorable Edward D. Re, Chief Judge of the U.S. Court of International Trade, sitting by designation.

1. There is no issue in this case that Perez also was known as Eddie Franco. In order to prove Perez/Franco's dual identities at trial, the government's evidence included the following: 1) testimony and in-court identification of Perez/Franco by coconspirator Thomas (R5–139–40, 328; R6–429–30), 2) testimony and in-court identification of Perez/Franco by coconspirator Dudas (R6–491), 3) testimony and in-court identification of Perez/Franco by a surveillance and arresting Drug Enforcement Administration (DEA) special agent (R7–671, 684–85), 4) identification of Perez/Franco in four photographs showing him walking from the parking lot to an airport hangar to meet Thomas and Dudas by the same surveillance and arresting DEA special agent (R7–673–74), 5) identification of Perez/Franco's photograph from the driver's license issued to Heriberto Perez by the same investigating DEA special agent (Govt.Ex. 23; R7–688), 6) mobile telephone records showing the billing address for the number used by Thomas, Dudas and Byrom to reach Perez/Franco to be Perez's home address (Govt. Exs. 1, 2, 3, 3A, 4, 5; R7–702–04, 718–20, 733–34, 736, 741), 7) testimony by the same investigating DEA agent and photographs of the white Cadillac driven by Eddie Franco with records showing that the owner of the automobile was Marianne Perez, Perez's wife, living at his address (Govt.Exs. 15, 17; R7–673–74, 677), and 8) a purchaser's money order receipt in the name of Franco which was in the possession of Perez when he was arrested (Govt.Ex. 24; R7–688–90). Appellant Perez's brief contains the admission that the government had "plenty" of nonprejudicial evidence to prove that Perez and Franco were the same person. Appellant Perez's Brief at 16.

Thomas and Dudas to Florida in Byrom's plane.[2]

In May, 1987, Thomas and Dudas flew the plane to an airstrip in Colombia; the coordinates and call signs were provided by Perez/Franco. Individuals met the plane in Colombia, and the leader informed Thomas that he had communicated with Perez/Franco by short wave radio. After the plane was loaded with cocaine, Thomas and Dudas flew it to Spanish Key, where the cocaine was off-loaded onto boats for transportation to Florida. Thomas and Dudas then flew the plane to Treasure Key, where they left it. Thomas and Dudas flew to Fort Lauderdale commercially.

Subsequently, Dudas flew the plane from Treasure Key to Freeport, and Byrom flew it from Freeport to Florida. Perez/Franco paid Byrom $300 for his portion of the return flight. Both Thomas and Dudas informed Byrom that the plane had been used to transport 500 kilograms of cocaine. Thomas and Dudas had several meetings with Perez/Franco after they flew the cocaine load from Colombia. Perez/Franco paid them only $2,500 each for this trip since the cocaine did not enter the United States, because it was stolen or lost by members of the off-loading crew in the Bahamas. Perez/Franco agreed to pay them the remainder of their money for the first trip, plus $200,000 for a second trip to Colombia for cocaine.

Following the first load of cocaine carried by Thomas and Dudas, Thomas told Perez/Franco that he wanted the ownership of the plane changed. Although Perez/Franco had financed the plane, the ownership had been placed in Thomas' name. Perez/Franco instructed Thomas to change the ownership of the plane into the name of Franco. Thomas used a Miami post office address on the new registration and back-

dated the Federal Aviation Administration form to May 1, 1987.

In June, 1987, Perez/Franco planned a second trip to Colombia with Thomas and Dudas to obtain 350 kilograms of cocaine to be flown to Stella Maris in the Bahamas for boat transportation to the United States. Thomas discussed the proposed trip with Byrom, who agreed to meet the plane in Stella Maris and to transport Thomas and Dudas back to the United States in his plane in exchange for payment from Perez/Franco. Byrom also informed Thomas that his friend Clyde would perform these duties if Byrom were unable to do so. Before the second trip to Colombia for cocaine, Perez/Franco had asked Dudas if he would be interested in using Byrom as a load pilot. Dudas informed Perez/Franco that Byrom had said that he would not smuggle drugs outside of the United States.

The second flight to Colombia for cocaine was interrupted on several occasions because of various problems with the fuel system. Perez/Franco coordinated with Thomas and Dudas the details of each delay, including their return to Florida by commercial airline. Perez/Franco arranged a charter flight for Thomas, Dudas and a mechanic to return to the plane for repairs. After the fuel pump was repaired, Byrom flew the plane from Rock Sound to North Eleuthera with Perez/Franco's approval. Thomas verified with Byrom that Byrom would meet Thomas and Dudas on Stella Maris when they landed with the cocaine load from Colombia.

On June 20, 1987, Thomas and Dudas finally left for Colombia to acquire the cocaine load, with the call signs and landing strip coordinates provided by Perez/Franco. Upon landing in Colombia, the

---

**2.** At trial, Thomas testified as follows regarding the information and instructions that he gave to Byrom:

Q Who was the one who approached Randy [Byrom]?
A I did.
Q What did you say when you approached him?
A I told him I was going to do a trip for Eddie, and I wanted a way off the island,

and he said okay, there would be no problem picking me up.
Q Did you tell him what kind of trip it was?
A Yes.
Q What did you tell him?
A I told him I was bringing cocaine from Colombia to Spanish Key.

R5–209.

plane was met by many of the same individuals who had met and loaded the plane on the first trip. Under armed guard, they loaded the plane with 350 kilograms of cocaine. The Bahamian in charge used a short wave radio to contact Perez/Franco, who denied Thomas' request that they be allowed to spend the night. Perez/Franco also had instructed Thomas to bring back a Colombian male, Miguel, who was a relative of the owner of the cocaine load.

After their departure from Colombia, the trio encountered a severe thunderstorm. Lightning struck the aircraft and caused malfunction of the plane's avionics or directional system. Dudas jettisoned some of the cocaine. When the right engine caught fire, Thomas landed the plane in the water off the shore of Andros Island in the Bahamas. The three men exited the plane onto a liferaft. Dudas and Miguel returned to the plane and removed the remaining packages of cocaine, which were carried away by the current.

Thomas, Dudas and Miguel floated ashore and camped on the island until July 11, 1987, when they located natives who took them to customs in Congo Town. Dudas called his wife and asked her to call Byrom and to tell him to come to get the men. The three men were permitted to stay in a hotel. Within an hour and a half, Byrom, who flew his airplane to Andros, met Thomas, Dudas and Miguel at the hotel. Byrom was accompanied by local police and an immigration officer. At the request of the immigration officer, Byrom flew Dudas and the officer in Byrom's plane over the crash site.

That evening, Byrom told Thomas and Dudas that he had been on Stella Maris as planned to meet them with the cocaine load from Colombia, and that he was chased from the island by a Drug Enforcement Administration (DEA) helicopter. Byrom also related that he had searched the islands for Thomas and Dudas at Perez/Franco's request and with his financing. Byrom told Thomas that he had arranged to have "friends" inspect the plane for incriminating evidence. Later in the evening, a Bahamian male came to Thomas'

room and informed him that the plane revealed no evidence of the cocaine.

The following day, Thomas went with the local police to inspect the wreckage. During this inspection, Dudas and Byrom flew in Byrom's plane over the island to see if they could spot any of the cocaine packages that Dudas had thrown from the plane. None of the packages were found. Byrom and Dudas returned to the hotel to wait for Thomas and the police.

Subsequently, an immigration officer informed Thomas, Dudas, Byrom and Miguel that they were to go to immigration in Nassau. The men flew in Byrom's plane to Nassau. The following day, Thomas, Dudas and Byrom were allowed to leave and flew to Fort Lauderdale in Byrom's plane. Miguel was detained as an illegal alien. Byrom called Perez/Franco, who provided the name of an attorney for Miguel. Byrom related Perez/Franco's message to Thomas and Dudas that they were responsible for getting themselves back to the United States. Byrom, who paid the hotel and other expenses for the men during their stay in the Bahamas, represented that the money was from Perez/Franco.

Upon arrival in Fort Lauderdale, Byrom checked Thomas into a hotel, initialed the registration form "RCB," and listed Thomas' address as the Fort Lauderdale Executive Airport. R5–282–83. Approximately a week after his return to Fort Lauderdale, Thomas met with Perez/Franco, who asked the details of the location for the deposit of the cocaine and discussed the possibility of a future trip. Perez/Franco told Dudas that he did not want Thomas to pilot another trip and that Dudas was to inform Thomas that he owed Perez/Franco $50,000 for the lost plane. Perez/Franco also informed Dudas that he had asked Byrom to search for Thomas and Dudas. Subsequently, Perez/Franco met with Thomas and Dudas, who related the detention of Miguel by immigration authorities. Perez/Franco offered to pay $30,000 for the return of Miguel to the United States.

On July 15, 1987, Byrom met with Clyde, the friend-pilot whom Byrom said would fly Thomas and Dudas from the Bahamas af-

ter the second cocaine trip if Byrom were not available. The purpose of the meeting was for Byrom to recruit Clyde to pilot a cocaine load from Colombia for Perez/Franco. Unknown to Byrom, Clyde was a confidential informant who had signed a consent form, agreeing to be wired with a recording device and to have the meeting with Byrom videotaped by agents of the Florida Department of Law Enforcement.

The audio/video tape, which was transcribed,[3] relates Byrom's asking Clyde to fly a cocaine load from Colombia to the Bahamas for Perez/Franco, with Dudas as

3. In pertinent part, the transcribed audio portion of the videotape states:

B [Byrom]: I know but anyway, u'm, anyhow, I've got another pilot that will go with you unless you want to do it single pilot.

CI [Confidential Informant Clyde]: Another pilot that will go with me, this guy right here?

B: No, ah ah, Bernie [Dudas] the guy that, the guy that was flying with Dave [Thomas], the navigator.

CI: I don't min [sic], I don't mind.

B: The only thing is you have to split the total figure.

CI: Oh, he wants to go for that ah does he, okay.

B: Yeah, but he wants ...

CI: The total?

B: Yeah you split it 50–50 he does the navigating, you do the flying.

CI: Alright.

B: Two heads are better than one.

CI: Yeah let me ask you this here, who's going to provide the airplane?

B: I can get the airplane, you know that 402, that I've been flyin?

. . . . .

CI: This is all the guy wants to put up, thats [sic] it?

B: Yeah.

CI: Alright tell thatah, it's negotiable but we gotta have, to we gotta have some merchandise first front us a keep till we get paid otherwise we won't release it.

B: Yeah, no problem there.

CI: No problem then, who's going to hold it in the Bahamas.

. . . . .

B: Now I've got somebody in the Bahamas that can hold the merchandise, do you know where ah what is it, Spanish Key right up there by Marsh Harbor?

. . . . .

B: But uh that's what's cooking. Still have my green card, you still have my green card. No I landed a plane....

CI: Listen, I want to ask you how much do you want to make of [sic] Franco I mean off the top without no work off this, I'll tell you not what I can to get, what I need.

B: Ah, huh.

CI: Alright, he's going to provide the airplane is that what you said?

B: I've got somebody that will give me an airplane I don't know I'm going to have to pay for the use of the airplane.

CI: This is all kind of shady you know because I'll tell you what if Franco whatever his name is doesn't want to put up money for anything he expects us to fly into there and the airplane gets taken or something—your [sic] out we're back in the same now we owe two people.

B: Right.

. . . . .

CI: ... I know he doesn't want to meet with me I don't know you tell me.

B: Yes, he'll meet with you.

CI: Will he?

B: Yeah.

CI: Fine, I'll talk to him in person and tell him look this is what I need.

B: Yeah.

CI: Ah, because you know twenty grand if I got to split it with another guy that ain't worth my time if this guy don't make any anything ·...

B: No, thats [sic] just what it comes up its most likely going to cost me 15 or 20 for the use of the aircraft.

CI: Yeah.

B: Okay, I myself whatever is involved however would like to make five ...

CI: At least, right....

B: Thats [sic] what I'd like to make.

CI: At least, at least.

B: I know, and in return for that I will be waiting in a designated place in the islands where the airplane will be left, do what ever and then fly to somewhere leave the airplane leaving my airplane let it sit there for a couple of days, you understand and then go back get it and bring it back. Know what I'm sayin?

. . . . .

CI: Okay were [sic] taking, whatever, whatever De Franco whatever Eddy whatever his name is ...

B: Yes.

CI: Wants to bring over, say he wants to bring over 500 keys.

B: 500

CI: 500 right wants to bring 500 those units over here to the islands I guess it would be somewhere around 2–1 1½–2 a unit that would be a million 2,000 a unit.

B: Yeah.

CI: Figure 1,500 a unit 750,000 thats [sic] what it runs 3000 in the states about 1500, per kilo.

B: For the pilot you mean?

CI: Yeah thats [sic] right, you didn't know that.

navigator—copilot. Byrom explained that Perez/Franco paid $200,000 for the trip to be divided between the pilot and copilot, that Byrom would provide the aircraft, and that Byrom had someone in Spanish Key who would hold the cocaine in the Bahamas. The cocaine load was to be obtained at the same Colombian airstrip used by Thomas and Dudas for the cocaine lost in the crash. Following the off-load, Byrom explained that he would wait at a designated location in the Bahamas and would fly the loaded aircraft to a different location where it would remain for a few days before he flew it to the United States.

In 1988, Thomas and Dudas began cooperating with DEA. In order to identify Perez/Franco to the investigating DEA agents, Thomas arranged a charter flight for Perez/Franco and used a plane provided by Byrom, from Opa-locka Airport in Miami to Santa Domingo, Dominican Republic. The charter flight took place in April, 1988, with Byrom as pilot and Thomas as copilot. Although Perez/Franco was not on the flight, he was at the airport prior to departure with the passengers, including his wife. Thomas introduced Perez/Franco to a DEA agent as Eddie Franco.

On December 6, 1988, Thomas, working as a DEA confidential informant, met Perez/Franco at the Tamiami Airport in Miami and recorded their conversation. They discussed the lost load of cocaine, and Perez/Franco explained that he did not hire the lawyer whom he obtained for the Colombian Miguel for Thomas and Dudas because of the expense to him.[4] Subsequent-

B: Because he's only like paying 250,000–200,-000.

.    .    .    .    .

CI: So if he wants to do it this way if he wants to pay 200 whatever he was paying, what was he paying your buddies?
B: Last trip they only got 130 because the smugglers wouldn't take one of the boats.
CI: What does he pay—what does he pay?
B: 200, 200 a trip.
CI: You tell him, or I'll tell him this if you want to do this, it's up to you really. 250, 250 thousand dollars
B: Right.

.    .    .    .    .

CI: 20 to 25 and you got to get an airplane you got to get your money.
B: Yeah, alright, figure 25 for you and we need 25 for me and the airplane.
CI: Yeah thats [sic] 50.
B: Right, we'll work it 60 that way we got a buffer zone.

.    .    .    .    .

CI: ... this is another deal, you talk to Eddy you tell him that ah, well [sic] meet and we'll talk, and do what we can, okay, alright. Tell him not to be to [sic] cheap last time and his boys crashed I known it's not their fault.
B: Yeah.
CI: But you know what happens nobody gets paid.
B: This is the kind of weather you want to do it in when the weathers [sic] like this out there it's got Loran, color radar everything but the kitchen sink.
CI: Talk me up if you can.
B: Oh, I will.
CI: This is it we'll do it.
B: That's no problem.

CI: Let me know when, give me a call.
B: Okay.
CI: Alright, I'm waiting, the ball is basically in your court so whatever you gotta do.
B: Well, I'll call, maybe we'll meet with him tomorrow.

.    .    .    .    .

B: I don't have a map to show you were [sic] you gotta to get it though [sic].
CI: He told me, Dave [Thomas] told me is it the same place?
B: The desert....
CI: Us at the same place Dave went?
B: Yes.
CI: He showed me.
B: On the map.
CI: Yeah.
B: Did he when ...
CI: Ah, when we were talking that one time.
B: Did he have a map then?
CI: No, but he said names I know exactly where it is.
B: Okay.
CI: Near the Venezualan [sic] coast.
B: You know where the bay is, right on the top there, but on the bay.
CI: Yeah, alright, let him get with me, and we'll talk, alright?
B: Alright.

Govt.Ex. 20B–2–9; R2–86–2–9.

4. In relevant part, the transcript of the conversation between Perez/Franco and Thomas states:

F [Franco]: So you got lost or it got lost
CI [Confidential Informant Thomas]: We got lost—we flew around the best thing I could do to save all of our asses
F: So why didn't you throw the merchandise out before you

ly, Perez/Franco and Byrom were arrested for conspiring to import cocaine into the United States.

## II. PROCEDURAL BACKGROUND

Perez/Franco and Byrom were indicted on two counts for conspiring with each other and other persons to import and to attempt to import cocaine into the United States. Count I alleges the importation conspiracy dates to be from approximately November, 1986, until July, 1987, in violation of 21 U.S.C. §§ 952(a) and 963. Count II alleges the attempted importation dates to be from approximately May, 1987, until June 29, 1987, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 952(a) and 963.

At trial in May, 1989, Thomas and Dudas testified as cooperating confidential informants. Perez/Franco, Byrom and confidential informant Clyde did not testify. The DEA special agent in charge of Clyde explained that Clyde was unavailable to testify because he was recuperating from severe burns sustained in a plane crash when he flew a smuggling operation for DEA in late April, 1989.[5] The court ruled that the DEA special agent had shown Clyde's unavailability. R6–351. The defense did not seek a continuance so that Clyde might be available.

The district court admitted the properly authenticated, July 15, 1987 videotape of the meeting of Byrom and confidential informant Clyde into evidence through the testimony of the Florida Department of Law Enforcement special agent who operated the recording equipment and monitored the meeting. Counsel for defendants Perez/Franco and Byrom objected to the admission of the videotape on the basis that it did not contain statements made in furtherance of the conspiracy, since the subject conversation concerned a future cocaine importation. R4–79, 82–83. Following the jury's viewing of the videotape and their receipt of a transcript of the audio portion, the district court gave the jury a limiting instruction. The court instructed that the recorded statements were not admissible as evidence of truth, but were admitted for the limited purpose of making

CI: We threw stuff out after we landed in the water
F: Why didn't yo [sic] throw it out before
CI: Cause we
F: When you found out where you were. Cause you knew
CI: I didn't know unless we threw some out when we were flying over Andros I don't know how many we threw out. Then when we landed and everything was cool I told Bernie [Dudas] I said get in their [sic] and ... get it out of the ... airplane, I said if the transmitter went off, ... the ... people come looking for us their [sic] going to find a ... plane load of coke, I said ... they going to find your [sic] going to go to jail and their [sic] going to ask all kinds of ... questions.... [U]nfortunately for everything we threw it out we put it outside the airplane and it ... went floating out but that was the only choice I had to do that the only choice I had. I couldn't have taken it to Nassau, we couldn't of landed on anything solid on Andros because all the ... fuel in their [sic] we would of ... exploded
F: Yeah
CI: Then that ... Randy [Byrom]
F: What did he do?
CI: When he got to Nassau he started acting his little, you know, he says well he talked to the attorney for Miguel apparently you had given him [a] name or something like that for and he says fine Eddie said the

attorney called Randy and Randy called me says "Eddie says you and Bernie are on your own" I said fine. I said we'll get out of here on our own
F: That's what I told the lawyer so he would'nt [sic]
CI: Yeah
F: You understand what I mean
CI: Yeah, yeah oh
F: If I say I am with you then they want more money
CI: Sure—no I had no problem with that

Govt.Ex. 19B–7–8; R1–43–Ex.C–7–8.

**5.** The DEA special agent testified that the extent of Clyde's burns included his fingers being melted together and his eyelids being shut to his skin. R6–338–39. Clyde had been hospitalized in Colombia for approximately a week, during which time the special agent spoke to him by telephone. *Id.* at 341–42. Because DEA considered his life to be in danger, Clyde was flown to Miami, where the special agent met him at the airport and entered Clyde in a hospital. *Id.* at 342–43. The agent consulted with Clyde's treating physician, who advised him of Clyde's serious condition. *Id.* at 343–44. At the time of trial, the special agent testified that Clyde was still bandaged on his face, hands and arms, and that he received six to seven hours of hospital treatment a day. *Id.* at 339.

the conversation between Byrom and Clyde intelligible.[6]

After the jury had deliberated for about three hours, they requested a tape recorder in order to hear again the audio tape of the December 6, 1988 conversation between Perez/Franco and Thomas. The counsel had no objections, and transcripts were not provided. In approximately another hour, the jury requested replay of the July 15, 1987 videotaped conversation between Byrom and Clyde. Prior to the jury's viewing of the videotape, the district judge again instructed the jury regarding their consideration of Byrom's statements.[7] Transcripts were not supplied to the jury. The viewing took place in the courtroom because of technical problems in the jury room. The counsel did not object to this procedure or to the rewinding and re-viewing of portions of the videotape, which was about fifteen minutes in duration, for approximately an hour. An hour after retiring to deliberate following viewing the videotape, the jury found Perez/Franco and Byrom guilty of Count I of the indictment and Perez/Franco guilty of Count II of the indictment.

On appeal, Perez/Franco challenges the district court's admission into evidence of his prior arrest for the purpose of identity and of Byrom and Clyde's videotaped conversation, wherein reference is made to Perez/Franco. Byrom claims that the district court erred in denying his motion for judgment of acquittal because the evidence was insufficient to prove that he knew that the cocaine flown from Colombia to the Bahamas was destined for the United States. Byrom also adopts all of Perez/Franco's arguments applicable to him, including the admissibility of the videotape. Our review of the record has shown ample evidence to support the convictions of Perez/Franco and Byrom for conspiracy to import cocaine into the United States.[8] We have concluded that only Perez/Franco's

---

6. The district court gave to the jury the following instruction regarding their consideration of the statements on the videotape:

Ladies and gentlemen, I need to tell you with respect to the video and audio tape you just heard between Byrom, and confidential informant, the informant will not testify during the trial of this case, therefore, his statements on the recordings are not admissible as evidence of the truth of the statement; that is, the statement that he made.

These statements, however, are admissible for the limited purpose of making recordings intelligible. Without hearing both of the parties to the conversation, it would be meaningless. If he just read the answers or statement he made to the confidential informant, they wouldn't make much sense. It is a little technical, but the statements of the informant himself, because he is not here for cross-examination, and evidentiary reasons, are not to be considered by you as part of the evidence in the case.

R7–804.

7. The district judge reiterated his prior instruction concerning the jury's consideration of Byrom's statements:

Now, one other thing about this tape. This is a tape in which the person Clyde and the Defendant Byrom were in a conversation, and we mentioned to you at the time you saw it last that it is the statement of the Defendant Byrom which is admissible for your consumption in this tape, but as a practical matter, it may be necessary for you to listen, and it is

necessary for you to listen to the other half of the conversation from this person Clyde. Just keep in mind the part of it which is really evidence and grist for your mill are the statements of Byrom rather than the other person.

Second Supp. R1–896.

8. In order to sustain a conviction under 21 U.S.C. § 963, the government must prove that a defendant agreed to import a controlled substance into the United States and that he knowingly and voluntarily participated in the agreement. *United States v. Obregon*, 893 F.2d 1307, 1311 (11th Cir.), cert. denied, — U.S. —, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990); *United States v. Bollinger*, 796 F.2d 1394, 1404 (11th Cir.1986), *modified on other grounds*, 837 F.2d 436 (11th Cir.), cert. denied, 486 U.S. 1009, 108 S.Ct. 1737, 100 L.Ed.2d 200 (1988); see *United States v. Badolato*, 701 F.2d 915, 919–20 (11th Cir.1983) ("The most basic element" of a drug conspiracy "is an agreement between two or more persons to violate the federal narcotic laws."). The agreement may be proved by direct or circumstantial evidence, including inferences from the alleged participants' conduct. *Obregon*, 893 F.2d at 1311; see *United States v. Leavitt*, 878 F.2d 1329, 1337 (11th Cir.), cert. denied, — U.S. —, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989); *United States v. Champion*, 813 F.2d 1154, 1168 (11th Cir.1987); see also *Bollinger*, 796 F.2d at 1405 (Although there was no direct evidence that the defendant knew that the cocaine, which he was convicted of conspiracy to import, was destined for the United States, this court found that the jury could infer that the

argument, that the admission of the videotaped conversation between Byrom and Clyde was error in its possible use to implicate him in the cocaine importation conspiracy, warrants discussion because of its potential for recurrence.[9]

## III. DISCUSSION

■ A statement made by a coconspirator during the course and in furtherance of the conspiracy is admissible as nonhearsay under Federal Rule of Evidence 801(d)(2)(E). Determining whether a statement is made in furtherance of a conspiracy pursuant to Rule 801(d)(2)(E) is a factual finding reviewed under the clearly erroneous standard. *United States v. Turner,* 871 F.2d 1574, 1581 (11th Cir.), *cert. denied,* ⸺ U.S. ⸺, 110 S.Ct. 552, 107 L.Ed.2d 548 (1989); *United States v. Dynalectric Co.,* 859 F.2d 1559, 1581 (11th Cir. 1988), *cert. denied,* ⸺ U.S. ⸺, 109 S.Ct. 1641, 104 L.Ed.2d 157, ⸺ U.S. ⸺, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989). "A finding of fact is clearly erroneous when after reviewing the entire evidence the reviewing court 'is left with a definite and firm conviction that a mistake has been committed.'" *Turner,* 871 F.2d at 1581 (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)).

■ The Supreme Court has clarified the analysis for determining when a coconspirator's statement is made in furtherance of a conspiracy under Rule 801(d)(2)(E). *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). Before admitting a coconspirator's statement over an objection that the statement does not qualify under Rule 801(d)(2)(E), a district court must be satisfied that the party offering the testimony has proved by a preponderance of the evidence that the declarant and the defendant were involved in an existing conspiracy and that the statement was made during the course and in furtherance of the conspiracy.[10] *Bourjaily,* 483 U.S. at 175–76, 107 S.Ct. at 2778–79; *Turner,* 871 F.2d at 1581; *Dynalectric,* 859 F.2d at 1581; *United States v. Santiago,* 837 F.2d 1545, 1549 (11th Cir.1988). In deciding preliminary questions of admissibility relevant to Rule 801(d)(2)(E) factual determinations, *Bourjaily* explained that the district court, under Federal Rule of Evidence 104(a), may consider any evi-

---

ultimate objective of the scheme was to transport the cocaine to the United States because: the planning of the importation scheme, including the defendant's participation, occurred in the United States; the defendant knew that the plane carrying the cocaine originated in the United States; all the participants with whom the defendant had dealings knew that the cocaine was to be imported into the United States; and all the participants, except the defendant, lived in the United States.). It is not necessary that the government prove "that each alleged conspirator knew all the details of the conspiracy. The government provides sufficient proof of knowledge by demonstrating the conspirator knew of the essential purpose of the conspiracy." *Obregon,* 893 F.2d at 1311. Consequently, an individual may be found guilty of a conspiracy, although he played a minor role in the total scheme. *Id.; Badolato,* 701 F.2d at 920.

**9.** In addition to Perez/Franco's argument that the videotape fails to implicate him in the cocaine importation conspiracy, he has claimed that the recording on the part of Clyde was not consensual, that the government did not prove the unavailability of Clyde, and that the videotape did affect the verdict as to Perez/Franco. We find that the record adequately supports the unavailability of Clyde and that there is suffi-

cient evidence of Perez/Franco's cocaine conspiracy participation, if not instigation and operation, to show that the videotape was not determinative or even critical to his conviction. For clarification, we comment briefly on Clyde's consent, which we find to be valid. Clyde signed a written consent form, which was entered into evidence. Govt.Ex. 28; R4–72, 74–76. When an informant gives his consent before the recording of a conversation, a warrant is not required. *United States v. Davanzo,* 699 F.2d 1097, 1100 (11th Cir.1983). Moreover, Clyde was cooperating with the Florida Department of Law Enforcement at the time of the recording and was acting under the direction of special agents, including briefing and installation of a body transmitter. R4–62–63, 68, 70–76; R7–788–90, 798. Even without the special agents' testimony that Clyde had consented, proof of his status as an informant and his participation in the recording establishes his consent. *See United States v. Richardson,* 764 F.2d 1514, 1524 n. 3 (11th Cir.), *cert. denied,* 474 U.S. 952, 106 S.Ct. 320, 88 L.Ed.2d 303 (1985).

**10.** We emphasize that the Supreme Court requires that the declarant, in this case Byrom, and the defendant, in this case Perez/Franco, both be members of the conspiracy, and does not restrict this requirement to the parties to the

dence, including hearsay, and is bound only by the privilege rules.[11] 483 U.S. at 178, 107 S.Ct. at 2780; *United States v. Chestang,* 849 F.2d 528, 531 (11th Cir.1988). *Bourjaily* reiterated that the prosecution is not required to demonstrate unavailability of a coconspirator declarant, and additionally held that no independent indicia of reliability is required when the evidence falls within a " 'firmly rooted' " hearsay exception, such as the coconspirator exception. *Bourjaily,* 483 U.S. at 182–83, 107 S.Ct. at 2782–83 quoting *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980) (citing *United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986)); *United States v. Norton,* 867 F.2d 1354, 1363 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 200, 107 L.Ed.2d 154, —— U.S. ——, 109 S.Ct. 3192, 105 L.Ed.2d 701 (1989).

■ Furthermore, *Bourjaily* held that the district court may analyze a coconspirator's hearsay statement as evidence of the conspiracy. 483 U.S. at 181, 107 S.Ct. at 2782; *see Chestang,* 849 F.2d at 531 ("The district court therefore did not err in considering the coconspirator statements in determining whether a conspiracy involving the ... [defendants] had been established."). The district court also may consider the alleged hearsay statement and independent outside evidence in making its evidentiary assessment. *Bourjaily,* 483 U.S. at 179–81, 107 S.Ct. at 2781–82; *Dynalectric,* 859 F.2d at 1581; *Chestang,* 849 F.2d at 531.

*Bourjaily* involved an informant who taped a conversation with Lonardo, who discussed the purchase of cocaine from the informant. During the conversation, Lonardo referred to a "friend," who would be waiting in a parking lot for the transfer of the drug. 483 U.S. at 174, 107 S.Ct. at 2778. The sale took place as described and FBI agents arrested Lonardo and the "friend"/petitioner Bourjaily after the cocaine was placed into Bourjaily's car. Lonardo did not testify, and the conversation in which Lonardo referred to the participation of his "friend" was admitted into evidence. The Supreme Court held that Lonardo's out-of-court statements indicated that Lonardo was involved in a conspiracy with a "friend," and that the statements taken as a whole were corroborated by independent evidence, although individually they may have been unreliable. 483 U.S. at 180–81, 107 S.Ct. at 2781. That independent evidence was Bourjaily's performing the acts described in the taped conversation. The Court concluded that the government had established by a preponderance of the evidence that Lonardo was involved in a conspiracy with the petitioner, that the district court's factfinding was not clearly erroneous, and that Lonardo's out-of-court statements were properly admitted against Bourjaily. 483 U.S. at 181, 107 S.Ct. at 2782.

■ The Eleventh Circuit applies a liberal standard in determining whether a statement is made in furtherance of a conspiracy. *Turner,* 871 F.2d at 1581; *Santiago,* 837 F.2d at 1549. *Bourjaily* has amplified this liberal standard, exemplified by the following Eleventh Circuit cases. In *Santiago,* an informant's testimony that a cocaine smuggler would use two women to carry the cocaine on their persons to the Atlanta airport on a flight from Nassau

conversation being analyzed for 801(d)(2)(E) admissibility. *Bourjaily,* 483 U.S. at 175, 107 S.Ct. at 2778; *Turner,* 871 F.2d at 1581; *Dynalectric,* 859 F.2d at 1581; *Santiago,* 837 F.2d at 1549. *Bourjaily* involved a coconspirator and an informant's recorded conversation, found to be admissible under Rule 801(d)(2)(E). Therefore, it is evident that Clyde's confidential informant status is irrelevant to our analysis as to admissibility of Byrom's statements, admissions or ratifications under Rule 801(d)(2)(E). *See Bourjaily,* 483 U.S. at 173–75, 107 S.Ct. at 2778; *see also Turner,* 871 F.2d at 1581 (The recorded conversation found admissible under Rule 801(d)(2)(E) was between a coconspirator and an uninvolved intimate female acquaintance in which the coconspirator discussed relevant facts concerning his conspiracy with the defendant.).

11. The Court clarified that: 1) out-of-court statements are only presumed unreliable and that the presumption is rebuttable by appropriate evidence, and 2) while individual pieces of evidence may be insufficient to prove a point, cumulatively, they may do so. *Bourjaily,* 483 U.S. at 179–80, 107 S.Ct. at 2781. The Court explained:

> Taken together, these two propositions demonstrate that a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence. A *per se* rule barring consideration of these hearsay statements during preliminary factfinding is not therefore required. Even if out-of-court declarations by co-conspirators are presumptively unreliable, trial courts must be permitted to evaluate these statements for their evidentiary worth as revealed by the particular circumstances of the case.

*Bourjaily,* 483 U.S. at 180, 107 S.Ct. at 2781.

was used to show furtherance of the conspiracy. This resulted in the conviction of the women, who arrived carrying the cocaine into the airport. This court found that the fact that the informant was not involved in the importation at the airport did not negate the fact that the statement was made in furtherance of the conspiracy. *Santiago*, 837 F.2d at 1549.

*Dynalectric* involved a conspiracy to violate the antitrust laws through bidrigging. Dynalectric complained that the district court should not have allowed the employee of another conspiring company to testify regarding information that he received from an anonymous telephone caller the morning that the bids were submitted. This court found that the evidence of the telephone call properly was admitted to show furtherance of the conspiracy. This court reasoned that the testifying employee had attended a meeting the preceding night at which he was told that he would receive a call if the conspirators agreed on the bid prices, and the testifying employee actually rigged the bid for his company based upon the information that he received from the telephone caller. *Dynalectric*, 859 F.2d at 1582.

In *Turner*, the defendant was convicted of conspiring to transport stolen securities in interstate commerce. Turner challenged the district court's admission of conversations, recorded by the British police, between a coconspirator and an intimate female acquaintance in the coconspirator's London hotel room. Because these conversations included discussions regarding the risks of cashing a check, the level of payment for the conspirators and the way that the money was to be transported to the United States, this court concluded that the district court's finding that these statements were made in furtherance of the conspiracy was not clearly erroneous. *Turner*, 871 F.2d at 1581. "The statement need not be necessary to the conspiracy, but must only further the interests of the conspiracy in some way." *Id.*

The application of the holdings of *Bourjaily* and subsequent Eleventh Circuit cases to this case removes concern that Byrom's statements, admissions or ratifications regarding Perez/Franco's involvement in the cocaine smuggling conspiracy can be used to implicate Perez/Franco in the conspiracy. Perez/Franco clearly is identified not only as a conspirator, but also as the instigator and director

of the cocaine importation conspiracy by the testimony of coconspirators Thomas and Dudas as well as the testimony of the various investigating agents. Therefore, there is ample independent testimony and evidence to incriminate Perez/Franco in the conspiracy without the videotape, which merely provides additional evidence. Byrom was involved actively as a coconspirator, demonstrated, for example, by his using his plane to retrieve Thomas and Dudas for which he was paid $300 by Perez/Franco.

In the subject videotaped conversation on July 15, 1987, Byrom and Clyde are discussing a subsequent Colombian cocaine smuggling airplane trip, which Byrom is arranging for Perez/Franco. The discussion includes the amount of cocaine to be smuggled and the money to be paid to the pilots and smugglers. In his attempt to convince Clyde to pilot the plane for the cocaine importation, Byrom explains his provision of the plane, the money to be paid by Perez/Franco to the pilots, the Colombian location for the cocaine acquisition, Byrom's meeting the loaded plane in the Bahama islands where it will be left, and his willingness to arrange a meeting for Clyde with Perez/Franco. Byrom clearly has detailed knowledge of the cocaine importation planned by Perez/Franco, and he demonstrates that he understands Clyde's references to Perez/Franco by his explicit responses, such as the amount of money Perez/Franco pays pilots for such a trip.

Since Perez/Franco unquestionably is identified in other portions of the record as a conspirator, the subject statements of coconspirator Byrom were made in furtherance of the conspiracy, albeit for a subsequent cocaine trip. This case is analogous to *Turner* wherein a discussion of future conspiratorial acts was found to be admissible because it furthered the interest of the conspiracy. Although the cocaine smuggling operation which was discussed during the taped conversation did not materialize, coconspirator Byrom was involved in planning it at that point in time, which falls within the period of the conspiracy covered by the indictment. The discussion concerned a future cocaine smuggle instigated by Perez/Franco as he had done in the past and the information given by Byrom to Clyde indicates his familiarity with Perez/Franco's importation operation. Perez/Franco was convicted on both counts of the indictment.[12] Given the abundant inde-

---

**12.** We observe that the jury's viewing and reviewing of the subject videotape may have been

for the purpose of deciding the conspiracy involvement of Byrom, who was convicted on the

pendent evidence of a cocaine importation conspiracy involving Perez/Franco and Byrom and the liberal standard for admission of evidence in furtherance of a conspiracy established in *Bourjaily* and exhibited in subsequent Eleventh Circuit cases, the district court's admission of the videotape was not clearly erroneous.

■■■The government also has argued that Clyde's statements regarding Perez/Franco were offered solely for the purpose of placing Byrom's comments in context. This circuit has examined a contextual argument in a similar case. *United States v. Price*, 792 F.2d 994 (11th Cir. 1986). Price, a government agent, was convicted for illegal sale of hashish oil. He complained that consensual tape recordings of his telephone conversations with confidential informant Carbone were used as the primary evidence against him. The confidential informant died before the trial. The trial court ruled that the tapes were not hearsay because they were not offered to prove the truth of the matter asserted. This court held that the Carbone statements were not admitted as adoptive admissions of Price and that the "single purpose for admitting the Carbone statements was to make understandable to the jury the statements made by Price himself." *Id.* at 997. Since the statements were not offered for the truth of the matter asserted, this court found that Price's sixth amendment rights of confrontation and presentation of a defense were not violated by introduction of the tapes into evidence. *Id.* Other circuits which have allowed the admission of such statements have done so for the purpose of putting the responses in context and making them intelligible to the jury and recognizable as adoptive admissions.[13] *See, e.g., United States v. Gutierrez-Chavez*, 842 F.2d 77, 81 (5th Cir.1988); *United States v. Lemonakis*, 485 F.2d 941, 948-49 (D.C.Cir.1973), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1587, 39 L.Ed.2d 885 (1974). The trial judge instructed the jury that they were to consider Clyde's statements not for their truth, but to put Byrom's comments, admissions and ratifications into context. Therefore, the contextual argument also provides a basis to accept Byrom's responses.

Accordingly, we conclude that the district court correctly admitted the subject videotape, wherein Byrom's statements may be considered statements by a coconspirator in the course of and in furtherance of the conspiracy under Rule 801(d)(2)(E). The contextual argument provides an alternative supporting basis for admission of the videotape into evidence. The district court's rulings with respect to all appellate issues raised by defendants-appellants Perez and Byrom are AFFIRMED.

first count of the indictment only, and not that of Perez/Franco, who was convicted on both counts.

13. We observe that the contextual argument is analogous to answers to interrogatories and admissions in response to requests for admissions. *See* Fed.R.Civ.P. 33, 36. The interrogatory answers and the responsive admissions are evidence; the interrogatories and requests for admissions, which give the context for the responses, are not evidence.