[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 21-12328

Non-Argument Calendar

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

LESLIE PAGAN,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cr-00253-TPB-SPF-1

————————————————

Before ROSENBAUM, JILL PRYOR, and GRANT, Circuit Judges.

PER CURIAM:

Leslie Pagan appeals her convictions for various drug charges, including one count of conspiracy to possess with intent to distribute one kilogram or more of a substance containing heroin and fentanyl, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846, and one count of distribution of a substance containing heroin and fentanyl resulting in death, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2. She argues that the district court (1) erred by instructing the jury on coconspirator vicarious liability under *Pinkerton*,[1] and (2) abused its discretion in admitting text messages between the victim and her heroin dealer, Pagan's coconspirator. After careful review, we affirm.

## I.    BACKGROUND

Jackylin Bonifacio sold heroin. For several years, Pagan was Bonifacio's supplier. Kaylei Jones was a friend and regular customer of Bonifacio's, purchasing heroin from her every day or two. Pagan's convictions stem in part from her involvement in the distribution of a controlled substance resulting in Jones's death.

The night before Jones died, Bonifacio purchased from Pagan 10 grams of a substance she believed to be heroin. At the time, this 10-gram supply from Pagan was Bonifacio's only on-hand

---

[1] *Pinkerton v. United States*, 328 U.S. 640 (1946).

source of product to sell because Bonifacio had sold her last few bags to Jones earlier that day.

The next day, Bonifacio sold Jones three bags of the product she had obtained from Pagan. Jones returned home, used some of the drugs, and died. Investigators determined the primary cause of death was fentanyl overdose.

At the scene, police found a used syringe. Testing revealed that the substance inside the syringe contained fentanyl and a small amount of xylazine. Analysis revealed that Jones also had trace amounts of xylazine in her system. Xylazine, a veterinary tranquilizer, is an unusual cutting agent that, according to the government, helped to identify the source of the drugs.

Police recovered from the scene Jones's iPhone containing text-message exchanges with two telephone numbers. One of the numbers was saved in the phone as a contact under the name "J." The other was unsaved. Jones had sent multiple messages to the unsaved number requesting drugs and syringes and arranging payment.

Using law enforcement databases, police identified the saved "J" number as belonging to Bonifacio. Based on the content of the messages, investigators determined that the two numbers likely belonged to the same person. In one message with the unsaved number, Jones was asked to pick up a prescription. Jones asked for the

person's full name, and the response from the unsaved number was "Jackylin Bonifacio." Doc. 207 at 127.[2]

To confirm that Bonifacio was the drug supplier behind the unsaved number, law enforcement used Jones's phone to set up another exchange the next day. Investigators texted the unsaved number requesting more drugs, and the responder agreed. Impersonating Jones, investigators represented that Jones's car was not working and requested that Bonifacio deliver the drugs. In response, Bonifacio arrived at Jones's house with the requested quantity of drugs.

Officers arrested Bonifacio. When they searched her and her car, they found the baggies of drugs that she had arranged to deliver to Jones, as well as additional drugs. They discovered that Bonifacio was carrying the phone belonging to the unsaved number on her person and found her personal phone—the saved number—in her car. Later testing showed that the drugs Bonifacio was carrying contained a mixture of fentanyl and xylazine.

When officers interviewed Bonifacio, she was reluctant to identify Pagan as her supplier. She initially identified another acquaintance who would occasionally provide her with small amounts of heroin when Pagan was unavailable. A few weeks later, she began cooperating with investigators and identified Pagan as her supplier. She confirmed that the drugs she was carrying when

---

[2] "Doc." numbers refer to the district court's docket entries.

she was arrested were from the same batch as the drugs she had sold to Jones the day Jones died. Bonifacio then executed multiple controlled purchases of drugs from Pagan. Testing revealed that the substances Bonifacio purchased from Pagan contained fentanyl and xylazine.

A federal grand jury charged Pagan and Bonifacio with conspiracy to distribute and possess with intent to distribute a controlled substance (Count One), and with distribution of a controlled substance resulting in death (Count Two).[3] For Count One, the indictment alleged that the conspiracy involved "one kilogram or more of a mixture . . . containing a detectable amount of heroin and . . . fentanyl." Doc. 67 at 1–2. For Count Two, the indictment alleged that the violation involved a mixture or substance containing "heroin . . . and . . . fentanyl." *Id.* at 2. Bonifacio pled guilty and testified for the government at Pagan's trial.

At trial, the government introduced evidence tying the drugs that caused Jones's death to Pagan through Bonifacio. The government sought to introduce testimony from a law enforcement officer about the content of text messages that Jones and Bonifacio had exchanged. Pagan objected that the testimony about the text messages was inadmissible hearsay. The government argued that the messages were not being offered for the truth of the matter asserted and that the text messages themselves would be entered

---

[3] Pagan was also charged with eight additional counts of distribution of heroin and fentanyl, to which she admitted guilt.

into evidence. The district court overruled Pagan's objection, noting that Bonifacio was scheduled to testify and could be questioned about the messages. The government then introduced into evidence, without further objection from Pagan, a summary of the text messages sent between Jones and Bonifacio in the days immediately preceding Jones's death. Later, Bonifacio testified, again without objection from Pagan, about the same information contained in the text messages.

At the close of trial, Pagan conceded guilt as to the existence of a conspiracy in Count One but disputed the amount of heroin involved and denied supplying the substance that killed Jones. The district court instructed the jury that it could find Pagan guilty on Count Two—distribution resulting in death—if she had "'knowingly' distributed a controlled substance," regardless of whether she knew the substance was heroin or fentanyl. Doc. 143 at 8.

The district court also gave instructions regarding coconspirator liability consistent with *Pinkerton v. United States*, 328 U.S. 640 (1946). The court instructed the jury that if it found Pagan guilty of conspiracy in Count One, it could find her guilty of Count Two even if she did not directly participate in the crime:

> During a conspiracy, if a conspirator commits a crime to advance the conspiracy towards its goals, then in some cases, a coconspirator may be guilty of the crime, even though the coconspirator did not participate directly in the crime.

So regarding Count 2 and Defendant Leslie Pagan, if you have first found the defendant guilty of the crime of conspiracy, as charged in Count 1, you may also find the defendant guilty of the crime charged in Count 2, even though the defendant did not personally participate in the crime.

To do so, you must find beyond a reasonable doubt: (1) during the conspiracy, a conspirator committed the additional crime charged to further the conspiracy's purpose; (2) the defendant was a knowing and willful member of the conspiracy when the crime was committed; and (3) it was reasonably foreseeable that a coconspirator would commit the crime as a consequence of the conspiracy.

Doc. 143 at 7. Pagan objected to the *Pinkerton* instruction, arguing that "I know that the case law is against us at this point in time, but we would state that objection." Doc. 209 at 3. The district court overruled Pagan's objection, and the jury found Pagan guilty. This appeal followed.

## II.    STANDARD OF REVIEW

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Wilk*, 572 F.3d 1229, 1234 (11th Cir. 2009). "An abuse of discretion occurs if the district court applies an incorrect legal standard or makes findings of fact that are clearly erroneous." *Id.* We will reverse a district court's evidentiary rulings "only if the resulting error affected the defendant's substantial rights." *United States v. Dodds*, 347 F.3d 893, 897 (11th Cir. 2003).

We review preserved challenges to jury instructions *de novo* to determine whether they "misstated the law or misled the jury to the prejudice of the objecting party." *United States v. Felts*, 579 F.3d 1341, 1342 (11th Cir. 2009). We review the phrasing of an instruction for abuse of discretion. *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000). "[D]istrict courts have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts." *Id.* (internal quotation marks omitted). We will not reverse due to an erroneous instruction unless "the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process." *Id.*

When a defendant does not object to a jury instruction below, we review for plain error. *United States v. Hansen*, 262 F.3d 1217, 1248 (11th Cir. 2001). "To prevail under plain error review, [the defendant] must show that the district court made an error, that the error was plain, and that it affected his substantial rights." *United States v. Iriele*, 977 F.3d 1155, 1177 (11th Cir. 2020). We will not reverse based on plain error unless the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Id.*

## III.    DISCUSSION

We first address whether the district court erred in instructing the jury on the *Pinkerton* theory of vicarious liability. Next, we address whether the district court abused its discretion in admitting

text messages between Jones and Bonifacio. Because we find no reversible error, we affirm.

### A.    The district court did not err by giving a *Pinkerton* jury instruction.

Pagan argues that the district court's *Pinkerton* instruction was improper because it allowed the jury to find her guilty of the substantive offense involving fentanyl in Count Two even if it found her guilty of a conspiracy to distribute only heroin in Count One. She contends, for the first time on appeal, that the court's instruction violated her rights to due process and a fair trial. We need not determine whether the objection was preserved because we conclude that the district court did not err, plainly or otherwise. Taken as a whole, the court's jury instructions did not allow the jury to use the *Pinkerton* charge to convict Pagan of the substantive offense in Count Two based on a different conspiracy than the one charged in Count One. Accordingly, we affirm.

A *Pinkerton* instruction allows a jury to find a defendant guilty of substantive offenses committed by coconspirators during and in furtherance of the conspiracy, even if the defendant did not directly participate in the substantive offense. *See Pinkerton*, 328 U.S. at 645–48. "Each party to a continuing conspiracy may be vicariously liable for substantive criminal offenses committed by a co-conspirator during the course and in the furtherance of the conspiracy, notwithstanding the party's non-participation in the offenses or lack of knowledge thereof." *United States v. Silvestri*, 409 F.3d 1311, 1335 (11th Cir. 2005) (emphasis omitted) (internal

quotation marks omitted). For liability to attach, the substantive offense must be a "reasonably foreseeable consequence of the conspiracy." *Id.* at 1336 (internal quotation marks omitted).

"[A] district court does not err in giving a *Pinkerton* instruction if the evidence was sufficient for a reasonable jury to have concluded, beyond a reasonable doubt, that the substantive counts were reasonably foreseeable consequences of the conspiracy alleged in the indictment." *United States v. Shabazz*, 887 F.3d 1204, 1220 (11th Cir. 2018) (alteration adopted) (internal quotation marks omitted).

Pagan's argument focuses on the precise wording used in the indictment compared to the jury instructions. Pagan was charged in the conjunctive in both Counts One and Two. That is, both her charge for conspiracy to distribute a controlled substance and her charge for distribution of a controlled substance resulting in death alleged that the controlled substance contained heroin *and* fentanyl. The jury instructions, conversely, were given in the disjunctive, allowing the jury to find Pagan guilty of conspiracy to distribute heroin *or* fentanyl.

Pagan does not dispute that "where an indictment charges in the conjunctive several means of violating a statute, a conviction may be obtained on proof of only one of the means, and accordingly the jury instruction may properly be framed in the disjunctive." *United States v. Simpson*, 228 F.3d 1294, 1300 (11th Cir. 2000). Instead, she points to language in the jury instruction on Count Two identifying only fentanyl as the "but-for" cause of

21-12328                Opinion of the Court                11

death. She contends that because the jury instructions in Count One were given in the disjunctive, and because only fentanyl was mentioned in Count Two as to the "but-for" cause of death, the jury could have found the existence of two separate conspiracies— one involving heroin, the other fentanyl—and held Pagan liable for a substantive offense carried out in furtherance of the fentanyl conspiracy, without first finding that she joined in that underlying fentanyl conspiracy.[4] We reject her argument.

In its *Pinkerton* instruction, the court properly instructed the jury that to find Pagan guilty on Count Two, it had to conclude that (1) during the conspiracy a conspirator committed the additional crime charged to further the conspiracy's purpose, (2) Pagan was a knowing and willful member of the conspiracy when the crime was committed, and (3) it was reasonably foreseeable that a coconspirator would commit the crime as a consequence of the conspiracy. The *Pinkerton* instruction told the jury that it could

---

[4] Pagan also points to the jury's verdict form, which included a special finding as to the weight of the heroin at issue in the conspiracy, as evidence that the jury could have concluded Pagan was engaged in a conspiracy involving only heroin, not fentanyl. But the only significance of the jury's determination that the conspiracy involved at least a kilogram of heroin is that this fact increases the statutory minimum sentence and thus must be proven to a jury beyond a reasonable doubt. *See Alleyne v. United States*, 570 U.S. 99, 104 (2013); *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). A conspiracy involving a kilogram or more of heroin is subject to an enhanced penalty of 20 years' to life imprisonment, whereas crimes involving a detectable amount of fentanyl are subject to zero to 20 years' imprisonment. *See* 21 U.S.C. § 841(b)(1)(A), (b)(1)(C).

find Pagan guilty on Count Two only if it first found Pagan "guilty of the crime of conspiracy *as charged in Count One.*" Doc. 143 at 7 (emphasis added). Count One charged Pagan with conspiracy to distribute "a controlled substance"; to obtain a conviction on this count the government was not required to prove she knew which controlled substance was involved. *See United States v. Colston*, 4 F.4th 1179, 1187–88 (11th Cir. 2021) ("[T]he defendant must knowingly possess, and intend to distribute, a controlled substance, but need not know which substance it is."). The district court further explained that the jury must follow all of the court's instructions considered as a whole. Based on the direct reference in the jury instructions to the conspiracy as charged in Count One, the jury was precluded from convicting Pagan on the substantive offense in Count Two based on a separate, uncharged conspiracy not encompassed by Count One.

The language in Count Two Pagan points to does not save her argument. Before addressing the findings necessary to trigger § 841(b)(1)(C)'s enhanced penalty for distribution resulting in death, the court instructed the jury on the elements of distribution charged in Count Two:

> The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt: (1) the Defendant knowingly or intentionally distributed a controlled substance, that is a mixture and substance containing a detectable amount of heroin or fentanyl; and (2) the Defendant knew at the

> time of distribution that the substance she distributed
> was a controlled substance.

Doc. 143 at 8. The court then instructed the jury, "[i]f you determine that the Defendant is guilty of distributing a mixture or substance containing fentanyl, you will then need to determine if [Jones's] use of that mixture or substance was the 'but-for' cause of [her] death." *Id.* at 9. Evaluating this language in context, we cannot say that the instructions permitted the jury to convict Pagan on Count Two based on a completely different conspiracy from the one charged in Count One. *See United States v. Cochran*, 683 F.3d 1314, 1320 (11th Cir. 2012) ("It is an established principle that we evaluate a jury instruction in the context of the overall charge.").

Moreover, Bonifacio testified that she had always believed she was selling heroin, not fentanyl, and the government presented evidence that the substances are nearly indistinguishable by sight alone. Even if the jury found that the coconspirators to the conspiracy charged in Count One intended to distribute only heroin, based on this evidence the jury nonetheless could have found that Bonifacio sold the fentanyl that caused Jones's death in furtherance of the same conspiracy. *See Colston*, 4 F.4th at 1188 ([W]hen the government charges violations of § 841(a)(1) and § 846, and mentions the specific drug involved to seek enhanced penalties under § 841(b)(1), it needs to prove the defendant's mens rea only for the substantive violation, not for the specific drug charged.").

Taken as a whole, the jury instructions did not allow the jury to convict Pagan of the substantive offense in Count Two based on

a different conspiracy than the one described in Count One. *See Prather*, 205 F.3d at 1270. The district court specifically directed the jury that it could find Pagan vicariously liable for Count Two only if it first found Pagan "guilty of the crime of conspiracy as charged in Count One," that her coconspirator committed the crime charged in Count Two, and that Pagan could have reasonably foreseen that her coconspirator would commit the crime. Doc. 143 at 7. Because we presume that jurors follow the district court's instructions, we affirm.

## B.    The district court did not abuse its discretion by admitting text messages between Jones and Bonifacio.

Pagan next contends the district court abused its discretion in admitting text messages between Jones and Bonifacio. In these text messages, Jones and Bonifacio arranged drug purchases in the days leading up to Jones's death. Pagan argues that these messages should have been excluded as hearsay because they were introduced to prove the truth of the matter asserted and did not fall within any of the hearsay exceptions. We disagree.

An out-of-court statement offered in evidence to prove the truth of the matter asserted in the statement is hearsay. Fed. R. Evid. 801(c). Hearsay is inadmissible unless the Federal Rules of Evidence, a federal statute, or rules prescribed by the Supreme Court provide otherwise. Fed. R. Evid. 802.

Statements "offered as a basis for inferring something *other* than the matter asserted" are not hearsay. *United States v. Cruz*,

805 F.2d 1464, 1478 (11th Cir. 1986) (internal quotation marks omitted). Thus, an out-of-court statement admitted only to show its effect on the listener is not hearsay. *Id.* "Likewise, out-of-court declarations that are more in the nature of an order or a request and that, to a large degree, are not even capable of being true or false are also not hearsay." *Id.*; *see also United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015) (questions and statements were "incapable of being true or false and thus [were] not hearsay").

What is more, statements used against an opposing party "made by the party's coconspirator during and in furtherance of the conspiracy" are not hearsay. Fed. R. Evid. 801(d)(2)(E). To introduce a statement of a coconspirator under this Rule, "the government must prove by a preponderance of the evidence that (1) a conspiracy existed, (2) the conspiracy included the declarant and the defendant against whom the statement is offered, and (3) the statement was made during the course of and in furtherance of the conspiracy." *United States v. Underwood*, 446 F.3d 1340, 1345–46 (11th Cir. 2006).

The district court did not abuse its discretion when it admitted evidence about the text messages because the text messages contained no hearsay. The text messages sent by Bonifacio were not hearsay because they were coconspirator statements. And the text messages sent to Bonifacio did not constitute hearsay because they were not introduced for the truth of the matter asserted.

We begin with the text messages Bonifacio sent. They were not hearsay because they were coconspirator statements. Pagan

conceded, and the evidence presented below established, that she conspired with Bonifacio to distribute heroin. She argues, however, that the government failed to show that the messages were sent in furtherance of the conspiracy. But the government presented evidence that Pagan supplied Bonifacio with heroin and that Bonifacio sold that heroin to Jones. Messages regarding their heroin sales were therefore sent in furtherance of that conspiracy. *See United States v. Byrom*, 910 F. 2d 725, 736 (11th Cir. 1990) (statements regarding plans for future drug smuggling trip were in furtherance of the conspiracy). To the extent any of Bonifacio's messages regarding heroin sales were offered for the truth of the matter asserted, they constituted coconspirator statements admissible under Rule 801(d)(2)(E).

Pagan argues next that even if Bonifacio's messages about the drug purchases were admissible as coconspirator statements, a portion of the messages should have been excluded because they were unrelated to the conspiracy. Specifically, she points to messages regarding Jones's retrieval of Bonifacio's medication from a pharmacy.

In one of the messages sent to the unsaved number, Jones asked Bonifacio for her full name so that Jones could pick up a prescription for her. Pagan argues this exchange was unrelated to and independent of the conspiracy between Pagan and Bonifacio and that it was offered to prove the truth of the matter asserted: that the unsaved number in fact belonged to Bonifacio.

Even assuming that this statement was not in furtherance of the conspiracy and constituted hearsay, any error was harmless. At most, the message showed that the unsaved number belonged to Bonifacio—a fact that the government had ample other evidence to prove. *See Rivera*, 780 F.3d at 1093. The evidence clearly established that Bonifacio was the owner of both phones. Using existing records, the police determined that the saved number belonged to Bonifacio. Based on the content of the messages, the police also determined the two numbers likely belonged to the same person. Upon her arrest, Bonifacio was in possession of both phones, and Bonifacio testified at trial that both phones belonged to her. Because the government introduced sufficient evidence to prove that Bonifacio owned the phone, any error "did not have a substantial influence on the outcome of the case" and thus does not warrant reversal. *United States v. Langford*, 647 F.3d 1309, 1323 (11th Cir. 2011); *see also United States v. Docampo*, 573 F.3d 1091, 1097 (11th Cir. 2009) (holding that admission of hearsay "alone does not mandate a reversal" unless it had "a substantial impact upon the verdict of the jury").

In addition, Jones's messages to Bonifacio were not hearsay. In these messages, Jones requested drugs and arranged times to pick up drugs in the days immediately preceding her death. But the messages sent from Jones were not assertive in nature. Rather, they were "more in the nature of an order or a request." *Cruz*, 805 F.2d 1464, 1478. None of these messages was offered for the truth of the matter asserted because these statements are incapable of being

proven true or false. *See Rivera*, 780 F.3d at 1092–93. Instead, they were offered to show their effect on Bonifacio and to provide context for Bonifacio's responses. *See id.* (rejecting argument that statements by third party on tape recorded conversation should be excluded wholesale as hearsay and noting that "the jury needed to hear them to give context to [d]efendant's responses"); *United States v. Perry*, 14 F.4th 1253, 1273–74 (11th Cir. 2011) (requests for assistance were offered to show their effect on the listener and therefore not hearsay).[5] We thus reject Pagan's argument that these messages constituted hearsay.[6]

## IV.    CONCLUSION

For the foregoing reasons, we affirm.

**AFFIRMED.**

---

[5] Similarly, the text messages sent by law enforcement to Bonifacio from Jones's phone after Jones's death were not hearsay. In these messages, the police requested drugs with the aim of identifying and arresting Bonifacio. The messages from law enforcement impersonating Jones were not offered for the truth of the matter. Instead, the messages were offered to show their effect on Bonifacio, who responded to the messages by showing up to deliver the requested quantity of drugs, supporting the inference that Bonifacio was the owner of the unsaved number. *See Cruz*, 805 F.2d at 1478.

[6] Because the non-assertive statements in the messages that related to drug exchanges did not constitute hearsay, we need not address Pagan's arguments that the statements do not fall within any recognized exception to the general rule against admission of hearsay. *See United States v. Mateos*, 623 F.3d 1350, 1364 (11th Cir. 2010) ("If the statement is not hearsay in the first place, there is no need for it to fit within an exception to the rule against hearsay.").